[Crim. No. 3567. Second Dist., Div. Two. Oct. 28, 1942.]

THE PEOPLE, Respondent, v. HARTLEY McMULLIN CALDWELL, Appellant.

Robert E. Ford for Appellant.

Earl Warren, Attorney General, and Alberta Belford, Deputy Attorney General, for Respondent.

MOORE, P. J.—Defendant appeals from an order denying his motion for a new trial and from the judgment and sentence after conviction of forgery and from five judgments and sentences for grand theft. The alleged forgery (count 1) consisted of defendant's signing the name of Carle L. Williams, an insurance broker, to a proposed contract of insurance and to the endorsement thereon. The acts constituting the five counts of grand theft were the alleged appropriations of the moneys paid as installments of the premium on the insurance contract.

The grounds of appeal are: (1) insufficiency of the evidence to support the judgments of conviction; (2) error of the court, in admitting proof of the custom and practice with reference to the authority of surplus line brokers in the United States; (3) errors in certain instructions on grand theft; (4) error in refusing to give certain requested instructions.

The facts which were determined by the jury and the trial court are as follows:

Prior to December 31, 1927, appellant was employed by one Carle L. Williams, an insurance broker. During such employment he placed a large policy with Lloyd's of London for the Department of Light and Power of the City of Los Angeles. After leaving Williams he engaged in the insurance business on his own account under the name of "British Foreign Syndicate," with offices in Nevada.

In June, 1940, the Pacific Discount Corporation, hereinafter referred to as Pacific, was engaged in the business of aviation finance. Because of the necessity of protecting the unpaid balance upon the purchase and sale contracts financed by Pacific it was necessary that the corporation be in a position to place

insurance upon the airplanes sold under such contracts. This plan led to negotiations between the officials of Pacific and defendant, who proposed the scheme of procuring from Lloyd's for Pacific a "Master Policy" under which Pacific would be authorized to issue a separate policy upon each plane sold under such contracts of purchase and sale financed by Pacific. During the course of such negotiations defendant stated to President Groendyke of Pacific that he had "his binding authority" from Lloyd's whereby he was authorized to sell insurance contracts for Lloyd's. Upon Groendyke's request to see such binding authority, defendant did not comply but on June 14, 1940, delivered a purported contract of insurance and received from Pacific $500 as part payment on the premium. Thereafter other checks were delivered to appellant by Pacific in full payment of the agreed premium. About three months after the first payment Mr. Groendyke told appellant that he was suspicious of appellant's authority and that he would deliver no more checks until Pacific should be satisfied with reference thereto.

Evidently for the purpose of convincing Pacific and its officers that he possessed such authority, appellant borrowed from one Dr. Anderson a policy issued by Lloyd's in 1939 through Newhouse & Sayre as surplus line brokers. He stated to Dr. Anderson that he had to use it as a sample. Thereupon he typed upon a piece of white paper the following words: "D Hudig & Co. of Rotterdam for account of British Foreign Underwriters, International Reinsurance Underwriters (Foreign) Carle L. Williams & Co. all for account of whom it may concern and/or Hartley Caldwell, Esq." He pasted the white paper across the face of the Anderson policy in the space in which the name of the assured appeared, then caused a photostat to be made of the Anderson policy, as altered, and presented the photostat to President Groendyke of Pacific, stating that it was a photostat of his binding authority.

Things appeared to have gone serenely until Pacific suffered some losses and the underwriters at Lloyd's repudiated the policy which appellant had claimed to have placed with Lloyd's. Then came the denouement disclosed by the record. The accusation against appellant brought the matter to trial upon the charge that the name of Carle L. Williams Co. had been forged to a certificate which declared that Carle L. Williams Co. had procured from Lloyd's of London the insur-

ance decribed in the certificate insuring certain risks in favor of Pacific; also that appellant had forged the endorsements upon the certificate and had appropriated the several installments of the premiums paid by Pacific for the insurance. While he did not take the witness stand his contentions below were, as they are here: (1) that he had implied authority to sign the name of Carle L. Williams Co. to the instruments in question and (2) that the State presented no substantial evidence to prove that he did not have a binding authority to issue a certificate of insurance.

The fact of forgery was established by the testimony of Mr. Williams that he did not sign his own name to the certificate or to the endorsement and that he authorized no one to do so. Appellant sought to overcome the testimony of Williams by proof of implied authority: (1) During the preceding two years Williams had placed about thirty policies with Lloyd's at the behest of appellant. But there is no proof that in any instance Williams permitted appellant to affix the name of Carle L. Williams Co. to a certificate; indeed there is no suggestion that a certificate had been issued by the broker as the basis for the insurance of any one of the thirty policies. (2) Some fourteen years prior to June, 1940, appellant had worked in the insurance office of Williams. During such period as an employee he had specific authority to affix the name of Williams to such instruments as required it. He contends therefore that such implication of authority continued across the span of years and that it persisted in full force and vigor at the time of his transaction with Pacific. But we cannot agree with this view. There is no legal basis for such presumption. There is no evidence that Williams authorized the signing of his name by appellant at any time after December 31, 1927. Williams knew of no instance of appellant's signing the name of Carle L. Williams Co. to a certificate of insurance during the fourteen years following the period of his employment. (3) As further proof of his claim of implied authority appellant cites the testimony of Williams, who admitted that during appellant's negotiations for the Pacific policy he advised Williams of certain developments in response to which Williams stated that he "did not want to be bothered with details."

However often appellant may have signed the name of Williams to bona fide contracts or certificates in bygone years,

and however often Williams may have stated to him that he did not wish to be bothered with details of negotiations in progress with reference to the Pacific policy, it cannot be fairly inferred that the authority appellant once enjoyed could have leaped across the chasm of fourteen years during which each went his own way. A further answer to such argument is that the authority to sign instruments executed in the pursuit of lawful transactions could imply no more than for appellant to sign certificates after he had first placed the required insurance with Lloyd's underwriters. Since no insurance was ever placed, as we shall presently see, there arose no occasion for the exercise of such authority if it had continued to 1940. Neither can it be said that any authority could have been implied for appellant to do a criminal act unless it had been first established that the two had conspired together to commit such crime.

There is no intimation in the record that Williams ever agreed that appellant should alter the Anderson policy for the purpose of convincing the officers of Pacific that appellant had a binding authority. Nor is there any indication that Williams ever knowingly received from appellant any portion of the moneys paid as premiums on the Pacific policy except that portion paid him as the surplus line broker. But, on the contrary, while a number of checks were received by appellant in payment of the premium, aggregating substantially $4,200, the net balance after paying the brokerage was appropriated by appellant. Williams' acceptance of the commissions cannot be fairly cited as proof of his knowledge of the signing of the certificate by appellant. There is no evidence that such act was ever brought to the attention of Williams prior to the trial of this action. The testimony of Williams that appellant had no authority to sign the name of Carle L. Williams Co. to the instrument in question is supported by the circumstances detailed and by Williams' innocence of participation in the nefarious designs of appellant. Upon the uncontradicted testimony of Williams and the cited circumstances we cannot say that the jury found appellant guilty of forgery upon insufficient proof. Where substantial evidence supports a conviction the reviewing court will not attempt to determine the weight of such evidence. Its sole function is to ''decide only whether upon the face of the evidence it can be held that sufficient facts could not have been found by the jury

to warrant the inference of guilt." (*People* v. *Newland,* 15 Cal.2d 678, 681 [104 P.2d 778].)

██ Referring to the proof of the forgery, appellant has assigned as error the ruling of the court allowing the witness Williams to answer the following question: "Did you ever authorize Mr. Caldwell or anyone else to sign the name of Carle L. Williams at the bottom of indorsement No. 1, a part of People's Exhibit 7?" The basis of his objection was that the question called for the conclusion of the witness. Conceding that it calls for a conclusion, the negative answer of the witness was harmless in view of the proceedings that immediately preceded the inquiry. In answer to proper questions the witness had stated that he had had a discussion with Caldwell about signing certificates; that Caldwell had told him that through the authority of the surplus line broker's license held by Williams the latter could sign certificates on any insurance placed under Caldwell's authority. Williams told Caldwell that until he got a direct connection with a brokerage house in London he would not sign his name to those certificates. Although Caldwell had cleared certain business through Williams' office as a surplus line broker, Williams had never signed any certificate for Caldwell. He had never before seen a certificate of "British Foreign Syndicate," Caldwell's trade name, upon which Williams' name was written. He had never seen a certificate in any of his dealings with Caldwell containing substantially the testimonial clause found on Exhibit 7, which is a declaration that Carle L. Williams Co. had procured insurance from Lloyd's for the benefit of Pacific. Williams further testified that the signature of Carle L. Williams found on Exhibit 7 was not his own signature; also, that the name of Carle L. Williams Co. affixed to Exhibit 5 was not his signature, and that he had never seen it prior to the institution of this prosecution. Exhibit 5 is a letter addressed to Pacific under date of June 3, 1940, on the letterhead of Carle L. Williams Co., signed by the same hand that executed the certificate and the endorsement. It sets forth the details of the terms of the agreement reached between appellant and Pacific for a policy in Lloyd's.

Inasmuch as Williams testified thus fully as to all of the conversations had with defendant with respect to Williams' not signing the certificate, and, under cross-examination, detailed all of his labors and relations with defendant, no prej-

udice could have been suffered by his answer to the criticized question.

■ We now proceed to a consideration of the issue as to whether the evidence is sufficient to support the five verdicts of grand theft. In order to clarify subsequent recitals it is appropriate at this point to explain the methods of operation at Lloyd's of London.[1]

1. Lloyd's corporation writes no insurance. It houses the active underwriters, i.e., the active agents of the 1,900 underwriters in its "big room," and supervises them after the fashion of the New York Stock Exchange in controlling its members. Any British subject may become a member, if the chairman of Lloyd's approves of his character and financial worth, upon his payment of an entrance fee of 55 pounds and an annual subscription of 30 pounds.* The underwriters are grouped into syndicates each of which is represented in the big room by an active underwriter who actually executes insurance in the name of his syndicate. The underwriters are governed by a committee of their own number. Each member makes a minimum deposit at the time of his admission. Such deposits are kept in a "central fund." At the outbreak of the current war the underwriters at Lloyd's transferred about $40,-000,000 to New York, with which it created the American Trust Fund. Into such fund all premiums on American business are deposited and from it all losses are paid.

Insurance by Lloyd's upon any risk, anywhere, may be procured only by a Lloyd's broker. He takes a card called the "slip" bearing his own name, a description of the risk, the amount desired, and calls upon the active underwriters in the "big room" at Lloyd's to subscribe the amount he undertakes on behalf of his syndicate. The "big room" is the subscribers' room. It is successor to the coffee room operated by Edward Lloyd in the 17th century where ship owners and merchants sipped coffee and exchanged news and views concerning matters vital to their business and insured one another's cargoes. By a process of growth the ancient coffee room became the domicile of groups of insurance underwriters who transact insurance contracts on properties in all parts of the world.

Lloyd's is not qualified to write insurance in California. Therefore, in this state a Lloyd's policy may be placed only through a surplus line broker. A local agent for a broker at Lloyd's is powerless to place a Lloyd's policy in California except through such surplus line brokers.

When a local party desires to write a type of risk at a specified rate, his broker correspondent at Lloyd's obtains for him a general or "binding authority" from one or more syndicates to place such insurance. Then, instead of the surplus line broker's cabling the details of each policy, he issues a "certificate" evidencing the coverage and transmits to the Lloyd's broker in London the list of insurance accepted. Similarly, in placing a single risk of some magnitude, the surplus line broker or the local agent of a broker at Lloyd's may request Lloyd's at London to write the specific policy. Upon receipt of a favorable reply from London that the desired insurance has been placed, the surplus line broker issues to the assured a "certificate" that the policy has been authorized. A copy of such certificate is at once mailed to London. Upon its receipt there it is checked against the slip which contains the record of the subscriptions of the underwriters before the policy is prepared

*Fortune Magazine.

All insurance contracts must be placed through a Lloyd's broker in the "big room" at Lloyd's. Every policy issued upon a California risk must be placed through the office of a surplus line broker in California (§§ 1730, 1760.5, 1761, Ins. Code), who in turn must operate through a broker at Lloyd's. Insurance contracts placed by Lloyd's in California may be negotiated and sold by a local agent with a binding authority from a Lloyd's broker, but he can place it only through a surplus line broker. In any event, before any Lloyd's insurance is in effect it must actually have been first subscribed by active underwriters at Lloyd's. Whenever a binding authority is issued by a broker at Lloyd's there is a document stating that such binding authority has been issued. One copy of such document is sent to the surplus line broker in America and another to the office of Duncan and Mount, New York counsel of Lloyd's. Unless it be filed there it has no validity.

Another important fact established by the evidence: Just prior to the commencement of the current war, in order to protect their policyholders in America, the underwriters at Lloyd's transferred to the United States the sum of about $40,000,000, with which they established Lloyd's American Trust Fund. Into this fund all premiums collected on business written in America must be deposited. Unless the premium on an American risk has been paid into this trust fund the insurance has not been underwritten by Lloyd's. A broker at London will not accept a premium from America because of the agreement that "all premiums for dollar transactions" must go through the American Trust Fund. Compliance with these regulations is indispensable to the procurement of a Lloyd's policy by any person in the United States.

Although the rules, regulations and practices of Lloyd's

---

in Lloyd's signing bureau. It is then signed by the underwriters, and after being checked by the broker it is forwarded to the California broker. But whether insurance be placed by use of a "binding authority" or by cabling a request for a specific contract on a single heavy risk, the insurance *must be placed* by a Lloyd's broker in the big room at Lloyd's. No insurance on any risk in California is possible unless it be in some manner first authorized by one or more of the syndicates at Lloyd's. If it be authorized and then placed, the London broker awaits a copy of the certificate from the surplus line broker which the latter issues upon receipt of notice that the insurance has been placed at Lloyd's.

In every case of a binding authority issued to an agent in America it is filed in the office of Duncan and Mount, counsel for Lloyd's in New York. Also, a record of it is "on file in shape of a slip with the Lloyd's brokers who transacted the binding authority."

require that every ''binding authority'' issued to a person in the United States be recorded in the office of Duncan and Mount, appellant's name does not there appear. Neither is any authority found there for placing the Pacific policy. The certificate issued over the name of Carle L. Williams Co. stated that the broker had procured insurance from the underwriters at Lloyd's. Williams denied that he had signed the certificate or that he had authorized appellant to sign that instrument. Appellant admits that he signed it but contends that he did it for Williams under an implied authority. But no such insurance had been first placed with the underwriters at Lloyd's. Williams testified that he relied upon appellant's statement that appellant had a binding authority from underwriters at Lloyd's to sell the policy and to have a certificate issued that the insurance had been placed at Lloyd's. He had no other information with respect to placing the insurance or the authority for issuing a certificate.

Prior to June 14, 1940, appellant had sold about thirty Lloyd's contracts. Such sales had familiarized him with the refined care of the Lloyd's transactions. Upon the happening of an event of such signal importance as that of placing an insurance contract of the size and value of that demanded by Pacific with the underwriters at Lloyd's, it is nothing short of singular to find that an experienced insurance man who had negotiated the Pacific policy could offer no proof, or explanation of his want of proof, of having negotiated such contract. He contends that three other methods besides that of using a binding authority for placing insurance at Lloyd's were shown by the evidence, and that the prosecution failed to show that the insurance was not placed by one of such methods. It will be recalled that it was defendant himself, in his bold adventure to sell the insurance, who made the claim that he had a binding authority from a broker at Lloyd's to sell the policy. However, the proof indubitably is that no insurance at all was ever placed by defendant with Lloyd's for Pacific. Hence, the matter of chief concern was not so much the method of placing the insurance as it was that the insurance applied for was actually underwritten. The circumstances placed before the jury amply warranted their finding that no insurance was ever placed at Lloyd's for Pacific, and therefore he appropriated the moneys of his victim.

Upon the showing by the prosecution that no binding authority had ever been issued to him, that no insurance for Pacific was ever underwritten at Lloyd's and that the books of the American Trust Fund fail to disclose the payment of any moneys into that fund on behalf of Pacific, no doubt could reasonably have remained in the minds of the jury that Pacific had not been insured by Lloyd's and that the title to the moneys received by defendant from Pacific never became vested in Lloyd's, but were the properties of Pacific at the times of the several payments. No explanation of the convincing events that surged like the rising tide against defendant was offered. They stand unchallenged. When approached by Howard Huntington on behalf of Pacific, appellant stated that payments to the trust fund have to be made through a third party. When demand was made upon him for his canceled checks showing payment of moneys into the trust fund, he made no response.

█ Appellant contends that, assuming that the evidence is sufficient to support any conviction of grand theft, the convictions on the five counts should have been but one. He argues that all of the payments by Pacific to him were prompted by one impulse arising from the representations made on June 14, 1940. On that day he represented that he had binding authority from underwriters at Lloyd's to issue the insurance contract which he delivered to Pacific that day. He now contends that conceding that representation to have been false, Pacific agreed to pay the premium required by the policy and that the payments made subsequently were made "upon the same reliance" that induced Pacific to make the contract on the day of the first payment.

Such contention does not exactly accord with the facts. While it is true that the theft in count six was induced by additional representations and assurance that appellant had a binding authority, yet this fact merely adds support to the conviction under that count in addition to that which supports the judgments under the preceding four counts. But there is still another fact that more completely refutes appellant's claim that he could have committed but one act of fraudulent pretense. The premiums payable under a "master policy" such as that described to Pacific by appellant were to be determined by the amount of insurance to be sold by Pacific. Whenever Pacific issued a contract under such master policy it relied upon the original representations of appellant, and

whenever appellant accepted the payment of any portion of the premium he impliedly repeated his first representation to the effect that the insurance issued by Pacific was covered by the underwriters of Lloyd's. Because of such implication and repeated representation it cannot with reason be said that he made but one representation. Also, it disposes of appellant's argument and his authority, *People* v. *Fleming*, 220 Cal. 601 [32 P.2d 593].

While appellant's first fraudulent representation of June 14th resulted in his acquisition of only $500 on that day, he did not actually gain possession of the other sums until the subsequent dates, as follows: $1,000 June 29, 1940; $402.75 July 30th; $1,804.10 August 9th, and $500 September 12th. He could not appropriate them before they came into his possession. He did not deposit them in a trust fund and later withdraw them. He took each sum as it was paid to him. When one has knowingly and designedly by fraudulent representations defrauded another person, such representation shall be treated as continuing so as to cover any money, property or services as a result thereof. (§ 484, Pen. Code.) The receipt and appropriation of the moneys to his own use on the five several dates constituted five separate acts, each a complete crime in itself. (*People* v. *Ellison*, 26 Cal.App.2d 496 [79 P.2d 732] ; *People* v. *Rabe*, 202 Cal. 409 [261 P. 303].)

This case is of the type in which the rule of convenience might properly be applied. While the information accused appellant of a forgery necessitating proof that he did not have the authority of Carle L. Williams to affix the latter's name to the certificate or to the indorsement upon it, appellant did not take the stand to throw any light upon that subject. Under circumstances such as these, confronted with the testimony of the officers of Pacific and by expert proof of Lloyd's procedure at London and in the United States, appellant should have assumed some of the responsibility of defeating the accusation rather than of maintaining the attitude of expecting the prosecution to fail in its proof. His borrowing of the old policy from Dr. Anderson and altering it; his procuring a photostat to be made of it; his presentation of that instrument to president Groendyke with the statement that it was his binding authority; his statement that he had placed the insurance through Poole and Sons, who had never heard of him; his receipt of the $4,200, no part of which was shown ever to have been paid either to Lloyd's American Trust

Fund or to Lloyd's of London; his repeated statement that his binding authority was a great secret, and the proof that no binding authority had ever been issued to him—these facts placed him in a position from which, in reason and sound judgment, it became not only incumbent upon him to make proof of his authority to sign the name of Williams to the certificate, but also to present proof that he had authority to act for a broker at Lloyd's. His proof of possession of any such authority would instantly have dispelled the web that entangled him, and if such proof existed it lay peculiarly within his knowledge.

The rule was recently determined to apply to the defendant in a prosecution for false imprisonment. (*People* v. *Agnew,* 16 Cal.2d 655-663 [107 P.2d 601].) It has been applied in the case of a prosecution for forgery where the defendant was accused by indictment of passing a note signed with the name of a person who did not exist. (*People* v. *Terrill,* 133 Cal. 120 [65 P. 303].) The rule of convenience was there applied when evidence was introduced to show that no man by the name forged to the fictitious instrument resided in the county. But whether the rule be invoked in support of the judgment, the circumstantial evidence introduced against appellant has woven such a pattern of his guilt as to render his innocence wholly improbable. While the establishment of a negative fact is oftentimes difficult, the ominous circumstances established against appellant leave no doubt that he never possessed any authority to place the Pacific insurance with Lloyd's. Therefore, the moneys which he took from Pacific in payment of purported premiums were taken by him upon the false representation that he had a binding authority to place the Pacific insurance with Lloyd's. Having no such authority, the moneys taken by appellant from Pacific continued to be the lawful property of that corporation as alleged in the information. If the jury believed the testimony and the fair inferences arising therefrom, it was sufficient to warrant a finding that appellant had neither authority to sign the name of Carle L. Williams Co. to the certificate he delivered to Pacific nor a binding authority from a Lloyd's broker to place the policy described in the certificate.

The sufficiency of the proof to support judgments which have been founded upon circumstantial evidence has been repeatedly presented to the appellate courts. In such cases we are often asked to supplant the verdict and decision of the trial court with a contrary judgment. Since the decision

in *People* v. *Staples,* 149 Cal. 405 [86 P. 886], it has been popular with prisoners who found themselves enmeshed in unchangeable strands of circumstance to attempt to defeat the judgment of trial courts upon the strength of that decision. But the falsity of such reasoning has long since been exploded. The language of the court in that case often quoted in support of such contentions was approved by the court then as correct usage in giving instructions upon circumstantial evidence. Its true significance has oftentimes been clarified. (*People* v. *Muhly,* 15 Cal. App. 416 [114 P. 1017]; *People* v. *Perkins,* 8 Cal.2d 502 [66 P.2d 631].) Latterly, judicial logic has been, in a number of cases, generously applied in upholding the prerogative of the trial courts to determine the ultimate fact of guilt. (See *People* v. *Newland, supra.*) The cardinal principles announced in that case are applicable to the instant case: (1) that appellate courts do not attempt to determine the weight of the evidence; (2) that their function is to decide only whether upon the evidence taken as a whole they can conclude that sufficient facts could not have been found by the jury to warrant the inference of guilt; (3) that they will not transgress upon the functions of the jury and the trial court by determining what facts are established; (4) that in order to justify a reversal of a judgment of conviction upon the ground of the insufficiency of the evidence "it must be made clearly to appear that upon no hypothesis whatever is there sufficient substantial evidence to support the conclusion reached in the court below"; (5) that under such contention the appellate court must assume in favor of the verdict the existence of every fact which the jury could have reasonably deduced from the evidence; (6) that because the circumstances in evidence might reasonably be reconciled with the innocence of the defendant will not warrant a reversal of the jury's determination if such circumstances reasonably justify the verdict. By applying these principles we are reassured that the conviction of defendant upon the circumstantial evidence was amply warranted.

██ Appellant's contention before this court that he tried to reach London to obtain evidence to prove his innocence is a vain and belated cry. The occasion on which he might with propriety have urged the existence of material evidence that he might offer to defeat the contention of the prosecution would have been his motion for a continuance of the day of trial. He will not be permitted to take his chances upon the

insufficiency of proof to be offered by the state and thereafter in this court plead the injustice of the verdict on the claim that he could have got evidence had he gone to London. Such contention would be available to appellant only under an assignment of abuse of discretion in denying him sufficient time to prepare or in refusing him the process of the court in his attempts to procure evidence in a foreign jurisdiction. If evidence of value to appellant existed in London, it is presumed that all facilities customarily available to a litigant would have been at the service of defendant.

(2) It is next contended that appellant suffered prejudice by admission of testimony of experts with reference to the authority of surplus line brokers in the United States to bind underwriters at Lloyd's. It is urged that evidence of custom is not admissible to prove what was done in a particular transaction, citing *Dutton Dredge Co.* v. *United States Fidelity & Guaranty,* 136 Cal.App. 574 [29 P.2d 316]. But the evidence offered by the experts was not evidence of custom and practice. On the contrary, it was evidence of the rules and regulations within the organization of Lloyd's underwriters. In order to understand an occurrence within a highly organized establishment it may become necessary to prove the procedure or the rules and regulations of its inner workings. Custom or usage may be received to prove methods adopted by a trade, industry or business, and is admissible for the purpose of proving the intention of parties to a contract which could not be done without the aid of extrinsic evidence. In the Dutton-Dredge Co. case an attempt was made in the trial court to introduce evidence of the custom and usage in the insurance world in order to prove that a contract would not have been made. Proof of custom is not admissible for the purpose of establishing such a fact.

In the case of the conduct of the business and affairs of an establishment, it is presumed that the regular course of business of such establishment is followed (Code Civ. Proc., § 1963, subd. 20) and that the books and records of an establishment truly reflect the facts set forth in such books (Code Civ. Proc., § 1953f).

The evidence received as to the regulations and procedure of Lloyd's was not to prove the authority of "surplus line brokers" in the United States to bind underwriters at Lloyd's. No evidence is pointed to as proof that a surplus line broker has authority to place such insurance. As such broker he has

no such authority. His only power as such broker is to place insurance with Lloyd's if he has been first lawfully authorized directly or through another to do so by a Lloyd's broker in London. Nothing was said by expert witnesses to indicate that a surplus line broker can by the issuance of a certificate bind Lloyd's. He cannot act effectively unless he is on the approved list of authorized agents in the office of Duncan and Mount, and he cannot write, issue or authorize insurance. He can merely negotiate for it, if he has a binding authority, and await notice from a Lloyd's broker that it has been underwritten at Lloyd's before he may safely certify to that fact. Lloyd's underwriters are not bound by any custom or practice in the insurance business. They are bound only by the contracts into which they enter. It is a rule of their organization and a condition of their doing business with any representative that only those possessing binding authority have the power to bind them upon a policy of insurance, and unless such contract be approved by Duncan and Mount, it lacks the necessary validity to confer power upon the representative to place insurance with Lloyd's.

 (3) Appellant complains that he was prejudiced by the fact that the court's instructions covered all three theories of grand theft without admonishing the jury that they should agree upon one theory. After instruction that the theft may be committed by larceny, embezzlement or by false representation, the court gave appropriate instructions on theft by false pretenses, or theft by trick and device and on theft by embezzlement. Appellant's apprehension is that a part of the jurors may have been convinced that defendant was guilty under one theory and that the remainder of the jury might have been divided in their persuasion on the other two theories. But the accusation in five counts of the information charged grand theft. Under the evidence, the jury might appropriately have concluded appellant's guilt under any one of the three above mentioned theories of grand theft as defined by section 484 of the Penal Code. If appellant had taken the moneys to deliver for Pacific to Lloyd's, it would have been the theft of Pacific moneys under the theory of embezzlement. If the jury agreed that the representations that appellant could bind Lloyd's were false and that appellant intended to and did acquire the money from Pacific for the purpose of converting it to his own use, such facts were sufficient to support a conviction under either the theory of

false pretense or of trick and device. It was not necessary to require the jury to agree upon the theory. If, under any one of the theories set forth, they believed appellant had gained possession of and appropriated to his own use the moneys of Pacific, he was guilty of grand theft. All of the instructions given were pertinent to the issues and were warranted by the evidence.

(4) The final assignment of appellant is that the court erred in refusing to give certain instructions as follows:

(a) "If the complaining witness received what defendant had agreed to give him, there would be no offense on the part of defendant. Where the prosecuting witness gets out of the transaction just what he bargained for, no offense is committed." This instruction assumes that it has already been determined that Pacific had received a Lloyd's policy. It had received only a false certificate that insurance had been placed. Therefore it had no application. Appellant agreed with Pacific to deliver to it a policy of insurance with Lloyd's of London. The only evidence received was that no such policy was ever received or issued. Had Pacific received the insurance for which it bargained, there could have been no wrongful taking and appellant would not have been accused.

(b) "As to the custom or the customary procedure followed ordinarily in the effecting of insurance through underwriters at Lloyd's, you have a right to consider such testimony, but you are not to infer from the admission thereof in evidence that such custom has always been followed to the exclusion of other procedure. Custom is merely the habitual manner of doing things and does not exclude the probability of doing such thing in some other manner." An instruction upon the subject of custom had no place in the instructions. We have already demonstrated that the proof presented by the experts was of the regulations as to Lloyd's manner of transacting its affairs, that is, the regular course of business done at Lloyd's. There was no occasion for custom of the insurance world to be introduced in evidence. Not only was the regular course of business at Lloyd's presumed to have been followed, but the testimony of the experts established beyond a peradventure that such regular course is followed by Lloyd's in all of its transactions; and it is also clear from the record that such method of procedure was not followed by appellant in his purported attempt to place a Lloyd's policy with Pacific.

(c) "You are instructed that authority to sign an-

other's name need not be expressly given; that authority may be given by implication. In considering whether or not the defendant herein had implied authority to sign the name of Carle L. Williams to the certificate of insurance to Pacific Discount Corporation, you may consider the previous relationship between the parties, whether or not Carle L. Williams had on previous occasions given the defendant authority to sign his name or whether on previous occasions the defendant had signed the name of Carle L. Williams with the knowledge of said Carle L. Williams, and his authority so to do was not denied by Carle L. Williams, together with all the other circumstances under which the said certificate was signed by the defendant.'' We have already shown that appellant had no authority to sign the name of Carle L. Williams to the certificate of insurance following the termination of his former period of employment December 31, 1927. It cannot with reason be said that there was any implied authority in appellant to sign Williams' name simply because he had worked for Williams fourteen years prior to June 14, 1940. During that fourteen years appellant did not, in operating a business under his own name or under the name of British Foreign Syndicate, use the name of Carle L. Williams. The question before the jury was whether appellant with intent to defraud signed the name of Williams to the certificate and endorsement in question, knowing that he had no authority so to do. To ask the jury to consider the employment of appellant by Williams some fourteen years previously as a basis for an implied authority to sign Williams' name to the certificate and endorsement in question would have been an abuse of the right to infer the existence of a fact by reason of other facts. Such inference cannot be fairly made from facts shown to have existed in a remote and distant past. There is no evidence in the record which fairly implied authority over any period of time. ▪ Proof of a business relationship between two men that ceased fourteen years ago will not justify a conclusion that the same relationship has been revived.

The facts that Pacific did not receive the insurance it bargained for; that no policy was ever authorized by Lloyd's underwriters; that in the regular course of transacting its business the moneys collected by appellant as premiums upon a Lloyd's policy would have been paid into Lloyd's American Trust Fund; that the American records of Lloyd's of London failed to disclose that any binding authority had been issued

to appellant or to the Carle L. Williams Co., or that either was on the approved list of Lloyd's brokers, and that appellant vainly attempted to establish his authority to sign the name of Williams—these are circumstances from which the jury properly determined that appellant not only had no implied authority to sign the name of Carle L. Williams to the certificate of insurance, but also that he had no authority to negotiate a sale of a Lloyd's policy.

The instructions were properly refused.

The judgments and the order denying a new trial are affirmed.

Wood (W. J.), J., and McComb, J., concurred.

A petition for a rehearing was denied November 12, 1942, and appellant's petition for a hearing by the Supreme Court was denied November 27, 1942.