[Crim. No. 3693. Second Dist., Div. Two. Dec. 6, 1943.]

THE PEOPLE, Respondent, v. ROGER EVAN JONES, Appellant.

Morris Lavine for Appellant.

Robert W. Kenny, Attorney General, Bayard Rhone, Deputy Attorney General, Fred Howser, District Attorney, and Jere J. Sullivan and Jesse J. Frampton, Deputies District Attorney, for Respondent.

MOORE, P. J.—Defendant was convicted on 17 counts of grand theft of which he had been accused by indictment. He was found not guilty on four other counts and was granted a new trial on one. He was sentenced to state prison on each of the sixteen verdicts for a term of years. His 17 grounds of appeal from each judgment may be reduced to four,

namely: (1) the insufficiency of the indictment, (2) the insufficiency of the evidence, (3) the refusal to give instructions offered by defendant, (4) errors in ruling upon offered evidence.

The specific crimes of which he was convicted are that by artifice he induced certain of the complainants to advance to him moneys for the purchase of whiskey; others to deliver to him their warehouse receipts for whiskey, hereinafter referred to as receipts. He commenced his operations about February 14, 1940. In order to expedite the accomplishment of his purposes defendant stated in substance to each of his contractees that the latter could more readily sell his stored liquor and at a greater profit than by a sale of it in bulk if it were first bottled; that he would have the whiskey bottled and sold on a specified date, and the proceeds, less a certain percentage for handling, would be paid to the contractee. It is the theory of the prosecution that as a part of his trick or device to obtain possession of the valued instruments he prepared a form of bottling contract whereby the owner of the receipt ostensibly agreed with R. E. Jones & Co., appellant's corporation, for the purchase of whiskey. One by one the trusting owners of the outlawed merchandise, as well as the other confident investors who during the same period entrusted large sums to defendant for the purchase of whiskey, became convinced that Jones had appropriated their receipts or moneys to his own use. Having heard their several experiences the grand jury returned the indictment. Defendant's criticism of the pleading is (1) that it failed to specify an offense; (2) that the phrase "warehouse receipts" is a conclusion; and (3) the "nature of the offense" is not alleged.

## THE INDICTMENT IS SUFFICIENT

An accusation drawn in conformance with statutory requirements is sufficient. Each count herein contains a statement in ordinary and concise language that the accused has committed a specified public offense without any allegations of matter not essential to be proved. (Sec. 952, Pen. Code.) It fully informs the accused of the crime charged against him.

The reasons for the technical requirements at common law no longer exist. Properly to accuse a person under existing procedure he must be provided with a copy of the testimony heard by the grand jury or by the committing magis-

trate. By the testimony and the concise accusation he is fully advised. (*People* v. *Beesly,* 119 Cal.App. 82, 84 [6 P.2d 114, 970].)　█　By reason of the repeal in 1927 of subdivisions 6 and 7 of section 959 requiring the act to "be clearly and distinctly set forth . . . in such a manner as to enable a person of common understanding to know what is intended . . ." it must have been the intention of the Legislature to make an indictment sufficient if it complies with the remaining provisions of that section and with sections 951 and 952. Section 951 contains a form whereby to accuse one of a public offense. The use of it in drafting an accusation, in the main, disposes of technical criticism. An indictment was held to be sufficient in charging that the accused "unlawfully took the property of one Gabriella Marello consisting of 30 shares of the Bank of Italy stock, Certificate No. B-34,302 of the reasonable value of Sixty Three Hundred Dollars ($6300.00) more or less lawful money of the United States." (*People* v. *Robinson,* 107 Cal.App. 211, 217 [290 P. 470].) The case of *People* v. *Davenport* (21 Cal.App.2d 292 [69 P.2d 396]) does not apply. That gentleman was accused of violating the Corporate Securities Act in that he sold an "investment contract" without having obtained a permit from the Division of Corporations. The vice of the Davenport information lay in the fact that the term "investment contract" was a conclusion of the pleader. Since there was neither pleading nor evidence before this court in that case of the nature of the contract, it could not be determined whether or not "investment contract" fell within the provisions of the Corporate Securities Act. Under that situation it behooved this court to assume that the contract was one which could lawfully be sold without a permit.

### The Evidence Was Sufficient

█　Most of the "sellers" of receipts were former clients of the Jones Company. Some of them had bought their receipts as investments. Past association had begotten a degree of confidence. But Jones did not rely altogether upon such confidence in proceeding with his new venture. He resorted to an effective strategy more completely to overcome resistance. Taking his cue from a proposal made to him by the United Bottling and Distributing Company of Chicago, which had sought to engage Jones to assist in obtaining for that corporation the receipts of the Jones' clients, defendant pre-

pared a form for a bottling contract between his own corporation and the owners of receipts. Such form as used in the first transaction is as follows:

"R. E. JONES & Co., INC.
315 West Ninth Street
Los Angeles, California

CONTRACT

"FRANK G. LILYGREEN, 2650 Flower Street, Huntington Park, California, hereinafter called the SELLER, and R. E. JONES & Co., INC., hereinafter called the BUYER, contract and agree by and between themselves unto the following:

"1. The SELLER hereby sells and assigns to the BUYER the following whiskey:

| Number of Barrels | Description |
|---|---|
| 35 | Bernheim, January & February 1936 distillation |
| | Above whiskey to be bottled in August, 1941. |

Title to pass upon delivery to the BUYER from the SELLER of appropriate whiskey warehouse receipts and execution of this agreement.

"2. The BUYER intends to have said whiskey bottled after the same has reached four years of age or over and will offer the bottled goods for sale. Within thirty days after said whiskey has been bottled for sale the BUYER shall pay to the SELLER such amount which the BUYER receives from the sale of said bottled goods (such sale to be made at the then prevailing Chicago market price), less all taxes, costs, expenses advanced or incurred by the BUYER in connection with the withdrawal of the whiskey from storage, transportation, bottling, stamping, labeling and $1.50 per case (BUYER's selling expense and profit). The BUYER reserves the right to have bottled and pay for (as herein contemplated) portions of the said whiskey from time to time as it reaches four years of age or over.

"3. The SELLER vouches himself to be the true and lawful owner of the said goods with full right and authority to dispose of the same in the manner aforesaid and further agrees to warrant and defend the said goods to the said BUYER

against all claims and demands. Accepted at the Office of the R. E. Jones & Co., Inc., Los Angeles, California.

"DATED February 14, 1940

FRANK G. LILYGREEN (SELLER)
R. E. JONES & CO., INC.,
By ROGER E. JONES (BUYER)"

By the use of this form and by his simultaneous declarations and promises defendant persuaded his clients to execute contracts and thereby gained possession of their receipts. The value of the receipts of each of the complainants was established by expert testimony and by proof of the sums received from actual sales of the whiskey in bulk. Those values ranged from $202 to $4,645. Instead of placing each warehouse receipt in a trust or escrow, as he had promised each party, to wait until the time for bottling should arrive, he made a sale of the whiskey represented by the receipt within two weeks after obtaining it. In one or two of the transactions the Jones Company was indebted to the vendee, in which event the proceeds of the sale of the liquor represented by the receipt were credited by the vendee to the account of R. E. Jones and Company. Following all of the other sales the money received by the defendant was deposited in the bank account of appellant's corporation at Los Angeles and was thereafter checked out by defendant in payment of the operating expenses of that company and of the expense of developing a mine at Downieville, California.

The criminal intent of defendant was further shown in that prior to the fall of 1939 the only source of income of the Jones Company was the sale of receipts. Commencing with January, 1940, that corporation transacted none of its customary business. For the year 1939, it had sustained a loss of $9,669. But from January, 1940, until May, 1941, it received $23,137 from the sales of the receipts taken from the complainants, and the further sum of $13,182 taken from three investors for the purpose of purchasing whiskey for them. Thus the total sum from both sources was in excess of $36,300, $30,439 of which was expended in the development of the mine.

Prior to 1940, Jones had associated with him in buying and selling receipts one Jasper, each owning fifty per cent of the Jones Company stock. They organized the Caledonia Development Company, hereinafter referred to as the Caledonia,

to exploit and develop their mining property, and veritably flooded its stock, which, with its water, was carried on the corporate books at a grossly exaggerated value. They had 200,000 shares issued to themselves for the mine, of a book value of $9,560. Jones and his company controlled the Caledonia. Besides these worthless Caledonia stocks the Jones Company carried on its books at grossly exaggerated values a number of worthless accounts.

Upon the decline of the whiskey market and of investments in whiskey warehouse receipts in the fall of 1939 appellant sent Jasper to Downieville to supervise the mining operations while he remained in the Los Angeles office of the two corporations. Before January, 1940, Jasper had returned to Los Angeles to urge upon Jones the need of a Trommell screen and of additional money with which to operate the mine. Defendant told him to procure the needed equipment: that the money would be available. Jasper returned to the mine and soon deposits began, and continued to be made at Downieville until the $30,439 had been received and expended. Prior to April, 1941, defendant had consummated all of the transactions which furnished the bases of his indictment in May, 1942. While Jones was negotiating for the receipts the books of both corporations were kept in his office by the same bookkeeper, and defendant from time to time examined them. At appellant's request Jasper severed his connection with both corporations in September, 1940.

Defendant argues that the deal with each ''seller'' was a civil transaction; that there was no proof of the existence of any warehouse receipts or of the inability or indisposition of defendant to fulfill them; that there was no proof of the value of the receipts; or of a breach of the bottling contracts. But established facts show that by the time appellant's business of dealing in receipts had failed to produce a profit he had become enamored of the mining venture, needed money to develop it and perceived that the whiskey business offered no legitimate channel whereby to gain the necessary funds. With his imagination lilting with visions of fortunes from gold he launched his campaign to gain possession of the receipts of his erstwhile patrons. Cloaked in the draperies of his corporation and pretending to act in its behalf, he boldly approached his unsuspecting victims. He assured them that he would not only save them from loss, but

would make them profits. Viewing his scheme most charitably and conceding that he intended ultimately to repurchase the whiskey, bottle and sell it and remit to the owners, yet he could have planned to do no less than to gain possession of the receipts, convert them promptly into cash and utilize the proceeds in developing his mine. He may have intended there to make a ''cleanup,'' return and repurchase the receipts. But no such design was divulged to his victims. He caused them to believe that their receipts would be held in an escrow until the whiskey should be removed from storage to be bottled and sold for their accounts. After months had passed he lethalized them with his false reassurances that their receipts were being held by a Chicago firm and that they would suffer the loss of much money if the whiskey were bottled on the date he had originally designated. So eager was he to acquire the funds needed for his favorite enterprise that he bargained with a Mr. Bailey to purchase and bottle 300 barrels at a cost of $10,500, $8,000 of which sum was actually paid to defendant in small, semi-monthly installments. He consummated a similar transaction with the witness Williams, who paid a total of $2,008.36 for forty-five barrels. When that gentleman made final payment of $800. in February, 1941, he received the bottling contract but never obtained the 45 barrels or a warehouse receipt or the money he had paid to defendant. Of the 16 complainants whose losses support the judgments, not one received any portion of the sum advanced, with the sole exception of Mrs. Lundquist, to whom Jones repaid $200 of the $3,263.42 advanced by her on the purchase of 150 barrels of whiskey. When she offered to pay the balance of the $4,500 he advised her that he had sold her receipts and that the $200 was a partial payment.

Upon proof of such facts the jury was amply warranted in returning the verdicts. The bottling contract and the false representations and promises of defendant constituted a trick and device by which defendant gained possession of the receipts while his victims did not intend to part with title. He dissipated the moneys thus garnered on his two corporations, in which not a complainant had the slightest interest. This was done by his checking the funds out of the bank in which he had deposited them to the account of the Jones company. Although each deal in its incipiency bore the color and trap-

pings of a normal, civil contract, yet when subjected to a post-mortem it exhaled the stench and disclosed the carcass of a fraud. (*People* v. *Epstein*, 118 Cal.App. 7, 10 [4 P.2d 555].) There appears no sign of good faith at any turn. ■ Each taking and appropriation was a grand theft. The use of the corporate name and the promises made in accomplishing his purpose were a camouflage of such common variety that no excess of genius was required to discern the fraud. ■ Parol evidence of all that occurred was admissible to show the intention of defendant. (*People* v. *Robinson*, 107 Cal.App. 211, 221 [290 P. 470].) Not one contractee suspected at the time of receiving his contract that before the next change of the moon his receipt would have passed to some stranger.

■ The contention that there was no proof of the existence of the receipts is without support. Each complainant testified that he had delivered his receipts to Jones, who testified himself that he had received them under a bottling contract and thereafter sold the liquor in bulk. Their profert could have added nothing to the sum total of the evidence of their theft. Their existence at the time of their acquisition and embezzlement was firmly established. Their exact language was collateral and therefore immaterial.

■ Appellant insists that there was no proof that he breached his contracts. But to each contractee he promised to "have said whiskey bottled" and sold and the proceeds less specified deductions remitted to "seller." He did not assume the payment of any charges subsisting or to accrue against the whiskey but only the right to deduct any such tax or other expense as he might have been required to pay. In all of the sales by Jones of the whiskeys represented by the receipts taken from complainants the purchasers assumed all obligations which constituted liens on the stored merchandise. Furthermore, the contention that there was no proof that Jones breached his contract is immaterial. Despite the language of the bottling contracts the jury were justified in finding that those contracts and appellant's promise to escrow them were a snare, or an artifice, or a trick, for procuring possession of the coveted receipts, and that they were promptly sold and the proceeds dissipated by defendant. His subsequent deceitful statement that to sell the whiskey at a still later date would be more profitable than to bottle and sell it at the time originally promised was made to calm the fears

of his victims and to induce them to feel secure while he negotiated with fate for the continuance of his liberty.

█ It is not to be concluded that the case was tried upon the theory that whiskey was stolen because the prosecutor at times asked a complainant while testifying whether he had told defendant that he might sell his whiskey in bulk. The very contracts issued to complainants on which appellant places reliance as proof of his innocence provided for delivery of ''appropriate whiskey warehouse receipts.'' Each complainant testified in effect that he delivered his receipts to Jones at his office, and got in turn a bottling contract. By the preliminary questions concerning the whiskey owned or with reference to its value it was not intended to adopt ''theft of the whiskey'' as the theory of the prosecution. The receipts were negotiable. They were delivered to appellant, who in turn passed them along to his vendees. In its instructions the court advised the jury that if the thing stolen is a written instrument ''the value of the property the title to which is shown thereby . . . is the value of the thing stolen.'' (Sec. 492, Pen. Code.) Such facts indicate clearly that theft of the receipts or the embezzlement of the moneys received for them was the theory of the prosecution.

THERE WAS NO PREJUDICIAL ERROR IN THE INSTRUCTIONS.

█ Every phase of the law properly applicable to the issues was presented by an appropriate instruction. It was therefore not incumbent upon the court to read any instruction offered by defendant. His complaint that he offered 100 instructions, not one of which was accepted, is without merit. Actually he submitted 84. █ The availability of an offered instruction is not determined by the size of the volume of which it is a part. Each must be appraised according to its own merits and its use must be determined by the exigencies obtaining.

█ The assignment as error that the jury were not properly advised that they must agree upon which of the three theories of theft as defined in section 484 of the Penal Code was committed is without support. Such instruction was unnecessary. (*People* v. *Caldwell,* 55 Cal.App.2d 238, 255 [130 P.2d 495].) In each count defendant was accused of grand theft. The jury were privileged to determine as to each count only whether that crime had been committed. By which of the methods of the committing grand theft, embezzlement,

larceny by trick and device, or false pretenses, was unimportant. All of the theories of theft were properly defined to the jury and the elements of each were named. Also, there was the added instruction that they must find, beyond a reasonable doubt under any theory, that he appropriated the receipt, or the money entrusted to him for investment, feloniously with intent to steal, and that he gained possession of the receipts or money by false pretense or by trick and device. If they did so find with reference to the warehouse receipts or the moneys advanced, it was inconsistent with a taking "openly and avowedly, and under a claim of title preferred in good faith. . . ." (Section 511, Pen. Code.) Had the jury believed defendant, the instructions given were sufficient authority to acquit him. The moment he appropriated the funds belonging to his clients to the use of his corporations the crimes of grand theft were committed. (*People* v. *Talbot,* 220 Cal. 3 [28 P.2d 1057].)

 Four of the refused instructions bore upon the good faith of defendant. For an accused to be entitled to an instruction that he must be adjudged innocent if he took the property openly and avowedly and under a claim of title in good faith, it must reasonably appear from the evidence that such defense is made in good faith. (*People* v. *Photo,* 45 Cal. App.2d 345, 353 [114 P.2d 71].) The record discloses no honest purpose of Jones but only his zeal to acquire and promptly sell the receipts and to appropriate the proceeds. The contracts alone evince a purpose to overreach the "seller." Nothing was paid. No obligation of the owner was assumed. In November, 1941, appellant wrote Eastern dealers for prices on bottling whiskey he "controlled," whereas the whiskey had been sold months before. Moreover, the sales of the whiskey while he held the receipts in trust dispels at once all right to assert a claim of title in good faith. (*People* v. *Steffner,* 67 Cal.App. 23 [227 P. 699].) That he might have intended to regain the receipts from his vendees is no defense or evidence of good faith if in fact he did not do so. (*People* v. *Bracklis,* 54 Cal.App. 40 [200 P. 1062].)

 Defendant submitted to the court some 24 instructions to acquit him of responsibility because the transactions of the "sellers" were with the Jones Company. By this host of instructions defendant sought to make the corporation alone civilly liable for the conversion of the receipts. They

constitute a series of arguments to persuade the jury that the bottling contracts vested title to the receipts in the Jones Company, an "artificial creature," distinct from its officers; that the latter may act as corporate agents and not be personally liable; that inasmuch as Jones, as such agent, received the receipts for the corporation, which sold them, he should be acquitted; that unless the contracts bound Jones personally he is not criminally liable; that if Jones entered into the contracts on behalf of the corporation he must be acquitted. These instructions assume that the corporation was an innocent creature, and had no knowledge of the fraudulent device of its master who must be without guilt because of the innocence of his artificial agent. Number 24 would absolve corporate officers from fraud if committed in acquiring property for the corporation; number 25 was an attempt to order an acquittal upon the mere finding that the transfer of the receipts passed title. Both omitted all reference to the fraud or the artifice practiced upon the owners of the receipts.

 It is the duty of the trial court to refuse an instruction to acquit a defendant upon one certain phase of the evidence regardless of other proof and of other theories presented. (*People* v. *Clark,* 145 Cal. 727, 729 [79 P. 434].)

 The remainder of this group of defendant's rejected instructions (26, 27, 29, 34, 35, 36, 37, 40, 41, 48, 49, 50, 51, 81) constitutes a series of declarations which in effect would acquit a corporate officer of fraudulent acts if it be shown that the corporation thereby acquired title to the fruits of his crimes. Such is not the law. Where a corporation is under the control of one person who violates penal statutes by use of the corporate name, the artificial entity will be ignored while the person who actually commits the criminal act will be dealt with as an individual. (*People* v. *Epstein,* 118 Cal.App. 7, 10 [4 P.2d 555].)

 Five rejected instructions (I-A, 1-C, 2, 5 and 30) all in effect declare that the existence of a specific intent to steal is an element of grand theft that must be proved. In each of the instructions given on larceny, embezzlement, and false pretense, the existence of the criminal intent was defined as an essential element, with a statement as to the time that intent must have entered the mind. It was therefore not error to refuse the proffered instructions on that feature of the law. (*People* v. *Robinson,* 107 Cal.App. 211, 228 [290 P. 470].)

 Nine offered instructions (6, 7, 8, 14, 44, 45, 62, 73 and 79) would have advised the jury that the nature of defendant's transactions must be determined by the bottling contracts. Such is an erroneous concept of the law. The state was not a signatory to those instruments (*People* v. *Robinson, supra*, p. 221) and was not bound thereby. The contracts were merely a part of the machinery employed in perpetrating the trick to gain the receipts. (*People* v. *Martin*, 102 Cal. 558, 568 [36 P. 952].)

With reference to 33 of the proffered instructions bearing upon theft, 12 of them (10, 42, 53, 59, 63, 63A, 65, 70, 71, 72, 86, 87) are attempts to state the law which was correctly given by the court. The remaining 21 contain either misstatements of the law or they omitted essential elements. The ability of defendant to replace the receipts would not have entitled him to an acquittal as declared in number 11. (Sec. 514, Pen. Code; *People* v. *Talbot*, 220 Cal. 3, 16 [28 P.2d 1057].) Number 12 would have imposed upon the state the burden of proving the existence of the merchandise represented by the receipts. The whiskey might have been burned or removed by burglars after its storage. All such instructions would have stultified defendant in view of his own testimony that he had sold the whiskey for his corporation. Number 13 omits to say that continued possession may be inferred from the issuance of the receipt. (Sec. 1858, Civ. Code.) Number 17 omits all reference to the question of the alleged fraud, or trick, used in gaining possession of the receipts, but merely states that title may be passed as in the case of any negotiable instrument. In like manner we might continue with the other instructions on theft by showing their several erroneous contents or fatal omissions, but the discussion would be mere repetition. Most of them demonstrate an attempt on the part of defendant to effectuate a favorable verdict by a consideration of the bottling contracts only, to the exclusion of the deceptive arts practiced by him. It was not incumbent upon the state to prove that the whiskey was in storage at the date of trial. Defendant testified that he had already sold it in bulk.

Many of the rejected instructions contain statements which would have deprived the jury of its privilege of finding the facts from all of the evidence. Proof of the financial status of defendant's corporations was rendered necessary

by reason of his assertions in court that the Jones Company and the Caledonia had assets sufficient with which to recompense the complainants. Such proof, adverse to defendant's assertions, and the argument thereon, were proper, and the instruction (89) to disregard them would have been error. Moreover, that instruction declared positively that there was no evidence that the stock of either corporation was watered.

Finally, the five proposed instructions (66, 67, 80, 88, 90) bearing upon the evidence are either repetitious or they are in themselves erroneous. Moreover, 66 is argumentative. Number 67 in effect says that the evidence is reasonably susceptible of two interpretations and that the jury are to adopt the one leading toward innocence. Such an instruction would be applicable only in a case in which the proof is all circumstantial. (*People* v. *Marvich*, 44 Cal. App.2d 858, 861 [113 P.2d 223].)

Number 88 is neither more nor less than an argument in justification of defendant's refusal to make a statement to the district attorney when that officer was investigating defendant's acquisition of the receipts. It does not correctly state the law. Silence under accusation of the police is evidence tending to prove guilt. (*People* v. *Sanchez*, 35 Cal.App.2d 231, 235 [95 P.2d 169].) Its weight as evidence is for the jury. The jurors might properly have reasoned that if defendant believed at the time of the investigation he had merely engaged in civil transactions with complainants, he would have said so to anyone. The court instructed the jury that the testimony with reference to Jones' refusal to be interviewed by the district attorney should be considered as evidence of impeachment only. Number 90 would have denied the jury the right to consider as proof a certain letter written by witness Smith to the United Bottling Company and received in evidence as a part of the *res gestae* of Smith's deal with defendant. The letter was some corroboration of the testimony of Smith, who had written the letter to United Bottling Company after appellant had falsely told Smith that he had sent Smith's receipts to that company.

No Prejudicial Error in Rulings on Offered Evidence.

While under cross-examination appellant was asked certain questions in order to ascertain whether he had not refused to make a statement to the district attorney on March 18, 1942, relative to his connection with the Jones Company

on the ground that it might tend to incriminate him. The basis of the objection to each question was that it was not proper cross-examination. It is true that on his direct examination nothing had been asked him by his own counsel concerning such statement. But the question was not asked to gain proof of guilt but, as the court stated, "by way of impeachment only." The court's ruling did not impair appellant's constitutional privilege of declining to discuss the matters under investigation. (*People* v. *Kynette,* 15 Cal.2d 731, 749 [104 P.2d 794].) Therefore, it was proper for impeachment purposes. (Sec. 2051, Code Civ. Proc.) That he may at that time have acted upon the advice of counsel did not make it inadmissible. (*People* v. *Graney,* 48 Cal.App. 773 [192 P. 460] ; sec. 13, art. I, Const.)

Defendant next assigns as error the admission in evidence of the books of account of the Jones Company. This ruling was correct. (Sec. 1953f, Code Civ. Proc.) The books were kept in the company's office and were posted from "items which Mr. Jones handed back" to the bookkeeper who was directly employed by him. Appellant had continuous access to the records, frequently inspected them and showed clients their accounts. On closing his office he took the records with him.

But in view of appellant's testimony that he had made the bottling contracts, received the warehouse receipts and sold the whiskey, there was no occasion whereby appellant could have been prejudiced by any books. Whether he had sold it in good faith for his corporation or fraudulently for his personal benefit was a question for the jury's determination.

The testimony of the salesmen of appellant was properly admitted. Each of them was directed by Jones to call upon the clients of the Jones Company to induce them to exchange their receipts for bottling contracts. They were to be paid $1.50 for each barrel of whiskey acquired. All "sellers" talked with Jones either before or after delivery of their receipts. The jury were warranted in finding that the representations of the salesmen were either first authorized or subsequently approved by appellant. (*People* v. *Robinson, supra,* at p. 226 ; *People* v. *Bryant,* 101 Cal.App. 84, 89 [281 P. 404].)

Much of the briefs of appellant contains arguments properly addressed to triers of fact. They are of no concern to the appellate court where there is substantial evidence

628

to support the verdict. (*Estate of Winzeler*, 42 Cal.App.2d 246, 248 [108 P.2d 720].)

The judgments are affirmed.

Wood (W. J.), J., and McComb, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied January 5, 1944.