[Crim. No. 5431.   Second Dist., Div. Three.   Jan. 30, 1956.]

THE PEOPLE, Respondent, v. FRANK BROES, SR., Appellant.

*Assigned by Chairman of Judicial Council.

Edward Mosk for Appellant.

Edmund G. Brown, Attorney General, and Elizabeth Miller, Deputy Attorney General, for Respondent.

SHINN, P. J.—In a jury trial Frank Broes, Sr., was convicted of two offenses of grand theft in the taking from Francis L. Jones of currency over the value of $200 and from Willard L. Russell of currency of the value of over $200. He made a motion for new trial which was denied and he was placed on probation, the terms to run concurrently. He appeals from the judgment and the order denying his motion for new trial. The grounds of the appeal are insufficiency of the evidence and error in the giving and refusal of instructions.

The factual situation out of which the transactions in question arose may be outlined as follows: There was a corporation known as North Palm Springs Development Company of which Broes was president and one Frank Warner, an architect, was vice-president. Russell and Jones were

electrical contractors. Broes interested them in a proposed venture to build a large number of residences on land which he claimed belonged to the corporation, the suggestion being that Russell and Jones would do the electrical work. Nothing came of this. About August 28, 1953, Russell and Jones were informed by Broes that the corporation was about to buy property at Western Avenue and Venice Boulevard in Los Angeles and to develop thereon a business center. He represented that leases had been signed and others were being signed for occupancy of structures to be built on the property. ■ He represented that $10,000 was needed to close the sale and he induced Russell and Jones to part with $2,500 each upon an understanding expressed in a letter given to each of them.[1] When these letters were received by Russell and Jones they bore the signatures of Broes and an attorney named Robinson who was acting for Broes. Russell and Jones each signed the letter he received and each gave Mr. Robinson $1,500 in cash and a check for $1,000 signed by R. & J. Electrical Contractors and payable to the corporation. Robinson turned over to Broes the two checks and $3,000 in cash for which Broes signed a receipt stating that he would put the money in an escrow as soon as it was opened. August 31, 1953, preliminary steps were taken for the opening of an escrow with Union Bank and Trust Company between the corporation and the owner of the Los Angeles property, West Coast University; although escrow instructions were prepared they were not executed and no funds were deposited. September 1, a commercial account was opened with Union Bank in the name of the corporation with a deposit of $5,000. No agreement was ever

---

[1] "In consideration of your advancing the sum of $2,500.00 to be placed in escrow at ⸱ ⸱ through which escrow the hereinafter described real estate is to be purchased by the North Palm Springs Development Company, a corporation, said corporation hereby agrees as follows: In case said escrow is completed you will receive 100% return on your said investment in approximately six months from the date of the close of said escrow.

"In the event that said purchase for any reason is not completed, then as soon as said escrow is abandoned your said sum of $2,500.00 so advanced will be returned to you in full.

"It is understood that your money so advanced may be used in the discretion of the undersigned on any operation connected with said real estate or the improvements thereon.

"The real estate herein referred to is located on the southwest corner of Western and Venice Boulevard in the City of Los Angeles, State of California. It is bounded by Venice Boulevard, Western Avenue, 18th Street and St. Andrews Place in said city."

executed for purchase of the property and the escrow, so-called, was cancelled. The corporation proceeded to spend the money. By check signed by Broes as president of the corporation, Mr. Robinson was paid $500 as a retainer for professional services. Within the month following the opening of the account, Broes, as president of the corporation, issued 32 checks on the account in amounts varying from $2.33 to $1,400, some of them for his personal expenses. On October 8th Broes told Robinson that he still had the $5,000 on hand stating ''I'm prepared to return it to them any time they demand it, but they seem inclined to allow me to keep the money and put it in some other corporation deal; but I would like to have that in writing so as to make it definite.'' Writings to that effect were prepared by Mr. Robinson and sent to Russell and Jones but neither signed the writing he received and neither informed Broes nor anyone else that he was willing for the money to be used other than for the purpose of acquiring the Western-Venice property. Broes wrote nine more checks, until by November 12th, the account had been reduced to $10.31. Some time in the early part of 1954, Jones, speaking for himself and Russell, told Broes they would like to have their money returned as they had use for it; they were put off by Broes on one pretext or another and no money was returned to either of them. Russell and Jones testified that they relied upon the representations and promises of Broes and did not authorize the use of the money otherwise than in accordance therewith. There was also testimony that about the first of June, 1954, Police Officers James and Johnson had a conversation with Broes in which they inquired about the use of the $5,000 and were told by Broes that he had given the $5,000 to Mr. Robinson to be put into an escrow.

The corporation, as we say, had no agreement for the purchase of the property and it was not shown that it had the financial ability to acquire it. The record discloses that on behalf of his corporation Broes offered to purchase the property for $290,000. The written offer and the unsigned escrow instructions called for the payment of $500 upon the signing of a contract, $10,000 when the escrow was opened and the balance at close of escrow. It would be expected that one who was endeavoring to show his good faith in such a transaction would make some showing of his ability to make good his representations. The appellant did not make such an effort. The corporation did not have money

or other assets available for use in the purchase. It was a fair inference that it did not even have $5,000 to return to Russell and Jones when they demanded it. Broes testified that he had no idea of his own net worth. When cross-examined as to where the purchase money was coming from, he testified: "I had arrangements with an attorney here by the name of Horowitz. He had several clients that represent millions of dollars. They had placed $175,000.00 in one escrow, Anaheim-Telegraph, and $350,000.00 on another one— when this other stuff took place it couldn't close, and that's where our front money was coming from." And he spoke vaguely of "The first mortgage that was on it, which was approximately $150,000.00, and some third that the insurance company had which we had negotiated and contacted." Mr. Horowitz was not called as a witness nor was there any evidence other than the assertion of Broes that any insurance company had made or had been asked to make any commitment for a loan on the property. It was a fair assumption that he could not have produced any corroborating evidence. Appellant admitted on the stand that Russell and Jones had paid over their money to be used in acquiring the property and that they did not authorize him to use it for any other purpose. He testified, however, that Mr. Robinson had told him that Russell and Jones had agreed that he might use the money for investment in any other venture of the corporation or of Broes himself but Robinson, testifying for the People, denied having made any such statement.

The jury could have inferred from defendant's testimony to the effect that he proposed to borrow $280,000 on the property in order to purchase it for $290,000, that he had no intention of buying the property at all. He knew that his offer had been rejected; he had paid nothing whatever on account of a purchase and the owners of the property had signed nothing whatever other than a written rejection of his offer. The evidence of guilt was not insufficient; it was little short of conclusive.

■ Broes did not borrow money from Russell and Jones. There is no basis whatever in the record for the argument that the transaction created only a creditor-debtor relationship and the authorities cited in support of that argument are beside the issue.

■ Embezzlement is the fraudulent appropriation of property by a person to whom it has been entrusted. (Pen. Code, § 503.) The essential elements of the crime are stated

in *People* v. *Borchers*, 199 Cal. 52 [247 P. 1084]. We have mentioned these elements, namely, delivery of the money to appellant solely for use in the purchase of the property, and its unauthorized appropriation and use to the detriment of the victims.

At the request of the People the court gave an instruction which properly defined (1) embezzlement; (2) obtaining property by false pretenses, and (3) larceny by trick and device. Appellant says that the court deleted a sentence that stated that it was necessary for the jury to agree as to which of the three types of theft was committed and that if there was not unanimity of decision on that point a verdict of guilty would be unwarranted. It appears from the original instruction that the sentence referred to was stricken before it was submitted by the People. Such an instruction as appellant advocates would have been confusing and improper. (*People* v. *Caldwell*, 55 Cal.App.2d 238, 255 [130 P.2d 495]; *People* v. *Jones*, 61 Cal.App.2d 608 [143 P.2d 726]; *People* v. *Nor Woods*, 37 Cal.2d 584 [233 P.2d 897].) Absent a finding by the jury that appellant acted in good faith and with honest intentions, all the inferences as to his motives would support only a conclusion of guilt of grand theft and it was of no consequence that some of the jurors might believe that appellant intended to cheat the complainants in the beginning and others might believe that he decided to steal the money after he got his hands on it. The verdict, of course, is a rejection of the claim that appellant's conduct was free from fraudulent intentions.

Complaint is made of two other instructions given at the request of the People. They were clearly correct statements of applicable rules of law. It was not error to refuse defendant's requested instructions as to the absence of fraudulent intent. The subject was fully covered by other instructions.

The judgment and the order denying motion for new trial are affirmed.

Wood (Parker), J., and Vallée, J., concurred.

A petition for a rehearing was denied February 10, 1956, and appellant's petition for a hearing by the Supreme Court was denied February 29, 1956.