[Crim. No. 4818. Second Dist., Div. Two. Nov. 26, 1952.]

THE PEOPLE, Respondent, v. AL S. WAXMAN,
Appellant.

Jerome Weber, Jess Whitehill and Harold I. Cherness for Appellant.

Edmund G. Brown, Attorney General, Frank Richards, Assistant Attorney General, S. Ernest Roll, District Attorney (Los Angeles), and Jere J. Sullivan, Deputy District Attorney, for Respondent.

MOORE, P. J.—Having been convicted on seven counts[1] of grand theft, appellant now demands a reversal on the grounds of insufficiency of the evidence, errors in rulings on the admissibility of evidence and errors in rejecting offered instructions.

In the spring of 1951 there was a scarcity of newsprint on the Pacific Coast. Its price had soared to $250 a ton. Appellant was publisher of certain neighborhood newspapers in Los Angeles. He thereby knew the needs of his fellow publishers and determined by reason thereof to enhance his prosperity. To that end he conceived the following device: He would pretend to have been accorded a special privilege by an official of the Powell River Sales Corporation of purchasing 1,000 tons of newsprint at $110 a ton; he would add to the initial cost $50 for the company's disloyal official, $40 for himself, $25 for a salesman's services and $9.00 a ton for transportation charges. Pursuant to the urgings of this fantastic chimera, appellant enlisted the witness S. C. Montrose to sell 200 tons of the paper at $234 per ton and explained to him that the official of the Powell River Paper Company had come down to see him and had authorized him to sell the 1,000 tons of "this very fine paper" but to suppress the official's name. Appellant promised that such request would be honored and the name kept a secret.

For the purpose of materializing the Waxman dream, appellant directed that Montrose should receive $25 a ton, payable out of the sums collected on receipt of the newsprint, at appellant's warehouse; he should collect half of the amount of each order and obtain the buyer's written agreement to pay the balance on delivery, and such writing should provide for the return of moneys in the event the merchandise should not be received within the time designated in the agreement. Waxman prepared one document entitled "Instructions to Montrose" whereby the latter was directed to collect one half the contract price and to obtain from the publisher on the latter's own stationery an order for Waxman to purchase the tonnage desired. A second document was the form of purchase contract between Waxman and the publisher. Its

[1]The seven thefts of which appellant was accused are as follows: $2,925 was taken from the Van Nuys Publishing Company; $2,925 from the same publisher; $11,700 from the Herald Publishing Company; $23,400 from the Citizen-News Company; $5,850 from the same publisher; $5,850 from the Rodgers-McDonald Publishing Company; $2,925 from the Progress Bulletin Publishing Company. The dates of the thefts were between May 23 and June 15, 1951.

terms substantially were : acknowledgment of receipt by Waxman for one half the amount of the order, a promise to return it should Waxman be unable to make delivery by July 7, 1951. It was entitled "Newsprint Purchase Agreement." A third writing was a form letter authorizing Waxman to purchase the amount of paper specified.

At the time of Montrose's agreement to engage in the effort to sell the newsprint, he inquired of Waxman why the sales could not be made by using the letter of credit or the escrow method for effecting sales. Appellant explained that such would not be possible; that by reason of the secret personality interested in the matter, the transactions would have to be effected by the use of cash.

Armed with a set of the documents prepared by appellant, Montrose called successively upon the publishers named in the indictment, procured their execution of the agreements and letters of authorization to buy and received from each a check for one half of the purchase order. After Montrose had sold 200 tons, appellant gave him permission to repeat his performance. After new orders for such tonnage had been received, appellant authorized his agent to sell another 200 tons. However, his total sales aggregated only 475 tons which brought to the Waxman treasury $55,575.

When July 6 arrived, appellant had Montrose advise the investing publishers there would be a delay in the arrival of the cargo until July 12 by reason of the shipping strike and to ascertain whether anyone would not wait but would prefer to have his money refunded. All but the Citizen-News agreed to the delay, whereupon after conference with Waxman, Montrose advised the Citizen-News to make a written request for the return of its money. After that event Waxman vanished to commune with the denizens of shadowland. His return to the walks of men was celebrated by his sudden appearance at the office of the district attorney of San Francisco on July 13, 1951. He introduced himself to Deputy Acton saying that he desired a warrant against "Charles Morrison"; that "Morrison" had called at his office and introduced himself as manager of the Powell River Paper Company; that they discussed the current newsprint shortage; that the present price was $110 a ton when available; that he had been with his company 30 years and his position there was the most important thing; that money on a side venture was secondary, but he could divert 1000 tons to Waxman's nominee for $160 a ton net, appellant to have all he

received above that price. Appellant reported that he told Acton that he immediately sold the Pasadena Independent 100 tons at $200 a ton, one half payable at time of the order, to be delivered June 7 but when it had not arrived on June 21 he returned the deposit at Morrison's suggestion. Waxman told Acton that Morrison said he could get 1,000 tons for appellant to sell on the same terms; that he thereafter sold 475 tons and received therefor $55,575; had come to San Francisco to meet Morrison in order to pay him $50,000 in $100 bills; had met Morrison and delivered the $50,000 when Morrison told him the newsprint would arrive in San Francisco Harbor on Thursday, July 12; they would meet again on Thursday when the cargo of newsprint would be placed at the disposal of Waxman who should forward it to his vendees; but Morrison did not appear; appellant made telephonic contact with the San Francisco office of the Powell River Company, learned that the manager's name was Jeffries, and when he asked for Morrison was chagrined to hear Jeffries say he had been with the company 15 years but had never heard of Morrison. In the course of the conference, Acton told Waxman: "For a man who has just been robbed of $50,000, you are the coolest man that has ever come into this office."

Following his return to Los Angeles, Waxman repeated to Montrose the story he had poured out to Acton, exhibited the copy of the complaint supplied by the deputy; told how he had taken the $50,000 to Morrison, how the latter had given him nothing and disappeared, how he had tried to locate him through the Powell River office at San Francisco and then visited the district attorney's office and filed a complaint, but could not give that officer any information as to Morrison's residence, friends or holdouts. After sharp words had passed, appellant stated that if he could not raise the money, he was "in a tight spot." He then had Montrose call at the Citizen-News to relate it to President Palmer. The latter was the first of the publishers to hear that appellant had departed with $50,000 in currency for San Francisco on July 9 to meet the man who had arranged to make available the newsprint; and that his name was Morrison. Montrose repeated appellant's story of how Waxman had delivered the money to Morrison at the St. Francis hotel with the understanding that the two should meet on the pier two days later when transfer of the paper cargo to Waxman should be made, but that was the last seen or heard of Mor-

rison or the $50,000 package of currency. But while at the northern city, appellant telegraphed all his victims to meet him at the Biltmore Hotel in Los Angeles on July 18. He there repeated all his asserted experiences with "Morrison" commencing with the latter's first call on appellant with the proposal to arrange for Waxman to have newsprint on condition that he receive for himself $50 a ton and that his name be kept secret. He repeated the account of his efforts to discover Morrison and his having signed a complaint before the deputy district attorney at San Francisco.

Thereafter, events occurred more rapidly for appellant than his own efforts to obtain newsprint had moved. In less than three weeks the grand jury presented the indictment accusing him of grand theft on seven separate occasions. In his statement to the district attorney he disclosed that he had received the checks of the publishers and deposited them to his personal account, withdrew the funds in currency, wrapped it in a newspaper and delivered it to Morrison in San Francisco.

No part of appellant's fairy tale was corroborated except his withdrawal of the "purchase money" from the bank and his visit to the northern city. His recital of a stranger's first visit to Los Angeles, the latter's agreement to allocate 1,000 tons of newsprint to Waxman at $160 a ton while its current price was $250, on the corrupt condition that $50 per ton be paid to the stranger personally as his profit— such a story is too superficial to seduce the belief of any reasonable mind that dwells in the world of the practical and commonplace. He learned nothing about the life of his phantom benefactor; requested no inspection of his credentials as an officer of the Powell River concern, made no inquiry into his background, or his knowledge of the newsprint industry, asked for no character references, exacted nothing in writing to evidence his agreement with one who had suddenly arisen from nowhere gratuitously to provide appellant an opportunity for good fortune. But more incredible still is appellant's ill-conceived route for effecting a final transfer of the imaginary cargo from "Morrison" to himself. That a buyer of any kind of merchandise would deliver $50,000 into the hands of the vendor, take no receipt, call in no witness or demand no guarantees is such a performance as might have occurred when Rollo sailed the high seas and rarely fulfilled a promise to the victim of his piracy. But it does not occur in the modern world. Not only is the

bleak narrative of appellant's negotiations with this chimerical person too absurd to attract the most brilliant talent for credulity but in the only two instances when he sought to fortify his narrative by appropriating a substantial fact, he failed. In order to establish that he was the victim of a swindle, he told Mr. Acton that he had telephoned the office of the Powell River company and *"asked for Morrison."* However, when Barbara Maywald appeared as a witness, she testified that only two persons were in the Powell River office, to wit, herself and Donald Jeffries; that when a voice called in on July 12, 1951, and said it was Waxman speaking, she told him the manager was not in. Waxman asked her his name; that when she answered "Jeffries," Waxman said no more—*did not mention the name Morrison.*

### Judgment Final

The judgment in a criminal action is final as to the sufficiency of the evidence unless *"it can be held that sufficient facts could not have been found"* by the trial court to warrant its implied findings, and before they "can be set aside . . . it must be made clearly to appear that upon no hypothesis whatever' is there sufficient substantial evidence to support the conclusion reached in the court below." (*People* v. *Jones,* 36 Cal.2d 373, 375 [224 P.2d 353]; *People* v. *Newland,* 15 Cal.2d·678, 681 [104 P.2d 778].) That there is a sound hypothesis in the law and also abundant material evidence contained in the record of this action to support the judgment cannot be doubted.

In order to simplify criminal procedure, the Legislature in 1927 consolidated the statutes on larceny, false pretenses and embezzlement in one, under the heading of "theft." (Pen. Code, § 484; see, also, §§ 485 to 490a.) While appellant recognizes that grand theft may be committed by proving that the accused obtained the money of his victims by any one of the three crimes, he has at great pains attempted to show that the evidence is not sufficient to justify a finding of guilt under any one of the three hypotheses embraced within section 484. He contends impliedly, if not actually, that each transaction was a *sale* of tons of newsprint; that he was neither bailee nor agent of the purchaser; that the money did not belong to the publishers; that it was not in his possession when embezzled; that he did not appropriate the money; that he is not shown to have intended to deprive his victims of their money.

Such contentions are contrary to the evidence. The proof is that appellant authorized Montrose to sell the paper on a commission basis. Pursuant to their agreement, the buyers paid one half at the time of the purchase and appellant promised to refund the money if the merchandise should not be delivered. He took the checks of the purchasers, deposited them to his personal account; withdrew $50,000 in one lot of $100 bills and transported it to a depositary unknown to all the world but Waxman. Nothing in the entire proof indicates that it was ever intended that appellant should use the money for his personal benefit. It was to be used solely for the purpose of purchasing newsprint. Taking his own words: he transposed $50,000 of the money received from the publishers to a man he calls ''Morrison''; took no receipt; kept no proof of Morrison's habitat or friends. The story told of his dealings with Morrison is so visionary as to justify the finding that it was false. Because the constituent elements of his narrative seemed to arise from airy nothingness, because it was not substantiated in the slightest degree by any witness and because the statements he made to induce the publishers to invest are, in themselves, so contrary to the common behavior of men, the verdicts were justified. If, at the time the money came into his possession, appellant intended to steal it, his act can constitute nothing more than a trick and device. (*People* v. *Jones*, 36 Cal.2d 373 [224 P.2d 353].) Under the implied finding, he intended to steal the money when it came into his hands. But if he did not intend to appropriate it then, he did so when he took it from his bank account and secreted it in places unknown to all others, and if he did not intend to steal the money at first, he did intend to do so later when he says he disposed of it and it was no longer available to him for the purpose of buying newsprint or of returning it to those who trusted him. (*People* v. *Mason*, 86 Cal.App.2d 445, 452 [195 P.2d 60], false pretense; *People* v. *Schroeder*, 43 Cal.App. 623, 625 [185 P. 507], embezzlement.)

Appellant says there is no evidence of any misrepresentations of material facts and for that reason he cannot be guilty of theft by false pretenses. On the contrary, he and his representative told each publisher that he had arranged for the purchase of newsprint from a Canadian concern, and it must be sold for cash in order to protect the official of the factory and they promised and inserted in every contract made by appellant a covenant to return the money if de-

livery of the paper could not be made. Upon that promise alone the jury would have been warranted in finding that at the time the publishers made the payments on the so-called contracts of purchase, they did so while relying upon the promise which appellant had no intention of performing. He would in that event have been guilty of theft by false pretenses. But he did more. He represented that an official of a newsprint factory had conferred a special favor by allocating to him 1,000 tons of his product for sale at a reasonable price. His pretended enterprise, all words, deceived his friends and his deceit was actionable.

### No Error in Rulings

Appellant contends that he was prejudiced by the court's overruling his objection to the testimony of Montrose whereby the witness was allowed to repeat his conversations with the several publishers who made the agreements to purchase the newsprint. Such conversations were not hearsay. It is contended that the witness had not been appellant's agent in making the sales but was an independent contractor over whom appellant had no control. Such contention is against law. Not only did appellant fail to set forth in his brief the events that occurred at the times of the alleged rulings but he did not even specify the pages in the transcript where they might be found. His claim is therefore without basis and should not be considered. (*People* v. *Jenkins*, 118 Cal.App. 115, 120 [4 P.2d 799].) However, it may be pertinent to observe that such contention ignores the proof that appellant prepared all the documents used by Montrose and that the latter followed the program of appellant even to the statements to be made to the purchasers. He had no discretion in preparing the contracts of sale, could not use a letter of credit, sell for cash on delivery or have the money escrowed. He was instructed as to what he should say with reference to the source of the product offered to the publishers. When Montrose deviated from the established wording of the contract with Rodgers-McDonald Publishing Company, he promptly obtained Waxman's written "O.K." He followed Waxman's instructions as to his negotiations with the publishers when informed that no newsprint would be available on July 7. All the evidence indicates that Montrose was the innocent dupe of Waxman's perfidious scheme and was his pliable tool in effectuating the latter's concealed criminal device. (See Civ. Code, § 2295.)

 Where a person has caused a crime to be committed through the instrumentality of an innocent agent, such person is the principal even though he did not appear at the scene of the crime. (*People* v. *Keller,* 79 Cal.App. 612, 617 [250 P. 585].) However, the respondent was not compelled to rely solely upon the testimony of Montrose as to his agency, In his statements to the district attorney, to the publishers at the Biltmore and in his own testimony, appellant admitted that he had authorized Montrose to sell newsprint and had signed the "Instructions to S. C. Montrose." Either Montrose or Waxman corroborated the publishers. It was both proper and correct for the jury to find that the representations of Montrose as to the availability of newsprint, its price and date of delivery were not only authorized but were subsequently approved by Waxman. (*People* v. *Jones,* 61 Cal. App.2d 608, 627 [143 P.2d 726].)

 The contention that the court erred to appellant's prejudice in permitting the publishers to testify as to their several conversations with Montrose is fully answered in the foregoing discussion of the court's ruling that Montrose's testimony was not hearsay. In no instance does appellant show the error of which he complains in general terms. It is not the duty of this court to explore the record and search the digests to determine an issue. (*People* v. *Jenkins, supra.*) The litigant should play a stellar role.

### TESTIMONY OF FAY WOOD PROPERLY EXCLUDED

Miss Wood testified that she was in February, 1951, telephone solicitor for the Northwest Leader, a neighborhood newspaper in Los Angeles; that at that time she had a telephonic conversation with a person who announced himself as Charles Morrison; that her publication was not controlled by Waxman. The conversation was properly excluded as hearsay. Neither was it admissible *to show efforts to produce the phantom "Morrison."* However, on appeal it is contended that the conversation was admissible to prove the fact of the conversation. Such argument is too late. When the court has excluded testimony upon a specific objection to testimony, it is not orthodox for the party on appeal to urge that the offer was made for a different purpose. (*People* v. *Brown,* 43 Cal.App.2d 430, 433 [110 P.2d 1059].) Because Waxman testified fully as to his meetings with Morrison; because Montrose and four publishers testified what Waxman told them about Morrison, appellant could

not have suffered prejudice by the exclusion of Fay Wood's testimony.

## No Error in Instructions

■ Appellant next contends that the court in its instructions erred in refusing to give the last paragraph of CALJIC Instruction No. 231[2] and that in failing to do so the court effectively put aside the requirement that one cannot be convicted of a criminal offense in a jury case without complete unanimity of decision by the jurors.

No error occurred. The last paragraph is not necessary. Its omission was proper since the jury were required only to determine as to each count whether the crime of grand theft had been committed. (*People* v. *Jones,* 61 Cal.App.2d 608, 622 [143 P.2d 726]; *People* v. *Caldwell,* 55 Cal.App.2d 238, 256 [130 P.2d 495]; *People* v. *Chavez,* 37 Cal.2d 656, 657, 670 [234 P.2d 632].) Courts and lawyers are no longer required to puzzle over fine distinctions between the crimes formerly denounced by separate statutes. ■ The crime is complete when the criminal agency appropriates the property of another to his own use without regard to the par-

---

[2]Sometimes it is difficult to determine which, if any, of three forms of theft the facts of the case show was committed, because while the distinction between them is real, the evidence may be susceptible of different reasonable interpretations. Those three forms of theft are: (1) Embezzlement; (2) Obtaining property by false pretense; and (3) Larceny by trick and device.

When one receives the possession of property lawfully by virtue of the fact that it is entrusted to him and thereafter he violates his trust and fraudulently diverts the property to his own use or to a use not authorized by the owner, his theft is called embezzlement.

When one knowingly and with design uses some fraudulent representation or pretense as a means of obtaining property from another, who, in parting with it, intends to transfer title as well as possession to the person who so obtains possession, the theft is called obtaining property by false pretense.

When one obtains possession of the property of another by some trick or device, intending to convert it to his own use, and to permanently deprive the owner of it, and the owner, although parting with possession to such person, does not intend to transfer his title to that person, the theft is called larceny by trick and device.

If you should find that the defendant committed any of the three kinds of theft just mentioned, you should return a verdict of guilty, and it will not be necessary or proper for you to state in your verdict which of the three forms of theft was committed.

[The following paragraph of the instructions was not given.]

However, it *is* necessary that you all agree as to which of the three types of theft was committed. If you should not be able to do that, the unanimity of decision necessary to warrant a verdict of "guilty" would be lacking, and it would be improper for you to deliver such a verdict.

ticular route he chooses to effectuate his wicked purpose. (*People* v. *Moorhead,* 104 Cal.App.2d 688, 694 [232 P.2d 268]; *People* v. *Hiden,* 102 Cal.App.2d 655, 659 [228 P.2d 95].) ▮ The question submitted was whether the accused had committed theft. The jurors might not agree on the ancient technical distinctions of the three crimes, but at the same time agree that the defendant stole the money. Appellant's constitutional rights were not invaded since the jury was specifically informed that "in order to return a verdict it is necessary that all twelve jurors agree to the decision."

▮ There was likewise no error in the court's action in modifying appellant's offered instruction[3] with regard to obtaining money by false pretenses. The omission of the third paragraph was proper since it was virtually a repetition of the legal principles enunciated in the preceding paragraphs. The practice of repeating instructions upon a particular subject though in various forms is not to be commended. (*People* v. *Ruiz,* 88 Cal.App. 502, 505 [263 P. 836].)

▮ No discussion need be had of appellant's contention that the court erred in refusing his instruction as to the intent required for the crime of theft by trick and device or false pretenses. Appellant's offered instruction was merely repetitive of a principle stated in other instructions.

▮ At the conclusion of the People's case appellant made a motion that the district attorney be ordered to elect the theory on which he was proceeding—embezzlement, lar-

---

[3]Where one is charged with having obtained money by false pretenses or larceny by trick or device, and the evidence shows that he did not make any representations to the complaining witnesses but that such representations were made by his agent, it must be proved that the defendant directly authorized or consented to such representations by the agent, because authority to do a criminal act will not be presumed.

In order to find defendant guilty of these charges on the theory of obtaining money on false pretenses or by trick and device, it must be proved that he had a specific criminal intent to defraud the complaining witnesses at the time that the alleged criminal act was committed, and such intent cannot be imputed to the defendant because of an act of his agent unless it is also shown that defendant directly participated or consented to such act or representations.

[Not given.] Therefore, I instruct you that if you find that S. C. Montrose was the agent of the defendant and made any false representations which were not directly authorized by the defendant or consented to by him, you cannot hold the defendant responsible for such representations, even though they were made by Montrose in connection with the transaction for which he may have been retained by the defendant.

ceny by trick and device, or obtaining money by false pretenses. The court's denial of that motion is now assigned as error. Such ruling was correct. Because the technical distinctions between these various types of larceny have been abolished and all consolidated under the one heading (Pen. Code, §§ 484-490a) an election is not required. Whenever any statute now mentions the old offenses, it is to be read as if the term "theft" were substituted for them. Inasmuch as the distinctions have been removed and the jury is relieved of the duty to designate the specific classification of the crime under the old statutes, it follows that the district attorney is under no legal duty to make an election. ▮▮▮ It is the prosecutor's sole duty to present the evidence and it is then the function of the jury, under proper instructions, to determine whether appellant committed "theft" by appropriating "property not his own, with intent to take it." (*People* v. *Hiden, supra*, p. 679.)

The judgment and order denying the motion for a new trial are affirmed.

McComb, J., and Fox, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied December 22, 1952.