[Crim. No. 5274. Second Dist., Div. Two. May 23, 1955.]

THE PEOPLE, Respondent, v. VINCENT JOSEPH LAMB, Appellant.

Edmund G. Brown, Attorney General, and Norman H. Sokolow, Deputy Attorney General, for Respondent.

Morris Lavine for Appellant.

MOORE, P. J.—Defendant was convicted of having forged a fictitious name on a bank check for the purpose of cheating a hotel and a bank (Pen. Code, § 470) and of having committed grand theft by feloniously taking a diamond ring of the value of $1,500 from one Frank Alten. By this appeal, he seeks a reversal on the grounds of insufficiency of the evidence to sustain the judgment, errors in the conduct of the trial, and misdirection of the jury.

### THE EVIDENCE IS SUFFICIENT

About one month prior to the events about to be narrated, appellant had been released from the Los Angeles County Jail where he had been confined for over two years pursuant to conviction for a misdemeanor. About the time

of his departure from that institution, his wife, June Lamb, had made the acquaintance of one James G. Law who worked in a responsible position and also wrote dramatic productions. He and Mrs. Law invited appellant and his wife to dine with them at home on Christmas Day, 1953. Mrs. Lamb introduced her husband as having just arrived from Chicago. The latter stated that he was an agent and representative with headquarters in Chicago and was in Los Angeles to obtain a television show for a group who were in California. Law replied that he had spent his life in show business and "was currently a free-lance writer." On the following day appellant returned to the Law home, examined some of Law's productions and departed with the promise that he might be interested in one entitled: "The Crossword Puzzle of the Air," hereinafter referred to as "Crossword." Some days subsequent, appellant returned and asked Law to rewrite and extend the Crossword. After he had made such revision, he delivered the script to appellant on January 4, 1954, in the belief that all appellant had said was true. By telephonic reports to Law appellant inspired him to believe he was a genuine agent of talent and success and finally on January 11 stated that he had sold the play, had a check "for $2,500 for a 30-day-option of the show"; that the sale price was $428,000—17½ per cent of which "would come to Law as creator of the show and that the option money should be divided between the two"; that Ken Murray had agreed to act as Master of Ceremonies in the show. He named other prominent persons with whom he pretended to have connections. Such communications were apparently continued until appellant finally made the acquaintance of Mr. Alten.

Appellant had no money as he stalked the streets of cities seeking a buyer for the Crossword. Late in the evening of early January 1954, Alten was assisting a friend who operated a bar in Pasadena. Appellant, accompanied by a woman whom he introduced as his wife, and himself as Mr. O'Shea, told Alten his wife had just arrived from Ireland; that he was an actor's agent; that he had a drama which he would likely sell to a friend. Alten inspected the document and said that he had a show that was good but believed the Crossword was better. Appellant told Alten that if he succeeded in selling his own, he might sell Alten's also. About 12:30 a. m., appellant returned to the bar with the same woman and informed Alten he had sold the Crossword and had been celebrating.

On January 21, appellant, representing himself as Mr. O'Shea, telephoned Alten and asked him to come at once to the Statler Hotel; stated they had placed the Crossword; that Ken Murray would be Master of Ceremonies and appellant would desire Alten to work with Murray as comic relief. Alten visited appellant at the hotel and was asked to read the Crossword; said that Alten's Irish dialect was impressive and would be the comic relief with Ken Murray; that he would have to be Alten's agent and that he would ask the producer for $1,000 a week as salary for Alten. Commencing with that interview, appellant continued throughout the day pretending they would visit Ken Murray at the Beverly Wilshire Hotel; stated that he was a guest at a large hotel; examined Alten's drama and the names of actors; pretended to be eager to employ certain actresses; offered to lend Alten $500 to buy better clothes; asked Alten to stop at any branch of his bank so that he might ascertain whether a draft he had received for the show had cleared; reported that the draft had been honored and there was money enough to pay the performers. By the time they reached the Alten home, Mr. Alten was convinced of the successful character of appellant. The latter continued his pretenses by dialing several numbers and conducting his conversations with pretended persons of high artistic rank. He pretended to employ Miss Ford and other girls at $250 a week for 39 weeks and asked them to meet him at a Glendale Studio for rehearsal on the morrow. He would take Alten to see Murray but for the fact that "Ken was drunk and was negotiating with Bing Crosby Enterprises."

As they left Alten's office, appellant asked Alten to find a person who would cash a check. He took appellant to a nearby liquor store and asked a Mr. Mitchell to cash the check which appellant wrote for $100. The merchant gave appellant $75 and promised the balance on the following day. Pursuant to appellant's request, Alten drove him to the Ambassador Hotel and to the Brown Derby where he said he had learned from his wife that his horses had lost and wished to check in at the Knickerbocker under the name of Danny Walsh.

After appellant had done some telephoning he became involved in an argument with the clerk and stated that he had a client with him and complained that the hotel was embarrassing him and he would not stand for such treatment. Thereupon, appellant askd Alten for the loan of his $1,500

diamond ring so that he might "put on a flash." Alten loaned the ring, appellant dressed, adorned himself with the diamond, accompanied Alten to the desk clerk; protested the abuse of himself by the hotel's having cut off his long distance calls; threw down $25 on the desk but never returned the diamond to Alten. He induced Alten to lend him his watch also. By false promises and subterfuges and pretenses as to his business transactions and connections appellant kept Mr. and Mrs. Alten on his hook. He returned the watch to Mrs. Alten, but the diamond ring was never seen until the police recovered it from a pawn broker to whom appellant had pledged it for a loan of $100. Although the check he gave Mr. Mitchell was worthless, appellant called and collected the balance of $25.

The People proved by a bank official that the Bank of America never had an account with Vincent O'Shea, the name appellant had affixed to the $100 check and that he had not made any arrangement for credit at such bank. Also, the witness McGinnis, room clerk at the Knickerbocker Hotel, testified that the check for $50 given by appellant as partial payment of his hotel bill was signed Vincent J. Walsh; that appellant then declared that it was good. But an officer of the branch bank on which it was drawn testified that his branch at 160 East Colorado Street had never had an account with Vincent J. Walsh and that there was no branch of the Bank of America at 130 East Colorado.

Contrary to the statements of appellant made to Law and Alten, competent witnesses testified that appellant was unknown to Ken Murray and had not talked with him over the telephone concerning the Crossword; that Attorney Bautzer had never been retained by appellant for a program known as The Crossword Puzzle of the Air. In fact, the representations of appellant that he was an actor's agent just arrived from Chicago; that he had sold the Crossword for $428,000, of Law's getting 17½ per cent thereof; of appellant's receipt of $2,500 for a 30-day option, of Law's getting one half of same, were, so far as evidence is concerned, nothing more than the ravings of a man in a delirium. None of it was proved to be true. Withal, appellant at the trial spurned the witness stand. He called an array of witnesses but none of them gave testimony to disprove that appellant had stolen the diamond from Alten or that he had uttered the fictitious check. The evidence was sufficient.

## RULINGS OF THE COURT

Appellant assigns as prejudicial the court's denial of

184

his motion to exclude the witnesses. The motion came early in the second day of the trial and at the conclusion of a session outside the presence of the jury. No reason was given for the motion to exclude the witnesses. The trial judge was in a position to know whether justice might be defeated if the witnesses were not excluded and it is presumed that if he had discerned that appellant might suffer prejudice by a denial of the motion the court would have granted it. The discussion preceding the motion was concerning the identity of a woman who had accompanied appellant to the bar where Alten worked. It did not relate in the slightest degree to the theft of the diamond ring or to the fictitious check presented to the bank by appellant. Inasmuch as no showing is made that the court abused its discretion, the judgment will not be disturbed. (*People* v. *Lariscy,* 14 Cal.2d 30, 32 [92 P.2d 638] ; *People* v. *Boyden,* 116 Cal.App.2d 278, 283 [253 P.2d 773].) At any rate, no showing of prejudice suffered by appellant on account of the court's ruling is made.

 Notwithstanding the noisy acclaim appellant made for himself as an actor's agent ''just arrived from Chicago'' whereby he furthered his scheme to gain the confidence of Mr. Alten and possession of his valuables, he deems himself aggrieved at the prosecution's proving by a deputy sheriff that appellant was a prisoner in the county jail from November 1951 to December 22, 1953. Appellant contends that by admitting such evidence, proof of another crime was made, to his prejudice. The fact is that by his representation that he was an agent from the East he gained the confidence of Mr. Law and thereby gained possession of the Crossword drama and gained Alten's confidence and his diamond and his endorsement of the $100 fictitious check. The deputy's testimony was competent to disprove the representations appellant had made to gain the confidence of his victims. Relevant evidence is not excluded merely by reason of its disclosure of other offenses by the accused. If by reasonable inference, pertinent evidence tends logically to establish any fact material to the issue of guilt of the defendant it is properly admitted. (*People* v. *Peete,* 28 Cal.2d 306, 315 [169 P.2d 924].) After appellant had stipulated the proof to be correct the court advised the jury that such testimony was offered ''only for the purpose of negativing statements'' made by appellant to Alten and Law.

Appellant makes a disjointed statement about his request for a clerk's transcript, a special request for all the testimony

in open court and in the judge's chambers; his motion to augment the record, his refusal of the Public Defender's office; the appointment of Mr. Brill, a member thereof, over his objection to act in an advisory capacity; his having numerous witnesses subpoenaed and the failure of the Sheriff to serve them, his desire for more time to bring in other witnesses; Mr. Brill's reason for not having a subpoena issued for Mr. Hunt; the court's reason for not allowing more time to get such witnesses was that defendant has had every opportunity during the eleven days of trial to have served them—just what grievance appellant means to spell out by such statements is not made clear. The record reveals that appellant conducted his defense, with the assistance of the Public Defender; had a fair trial and the court was indulgent.

■ The denial of his request for more time to procure other witnesses was correct in view of appellant's neglect for 11 days to attempt to serve his witnesses. On April 26, 1954, the court told appellant that the trial would commence on May 6. It did begin on May 10 and the People did not rest until May 21. Not only was the court's ruling correct, but it was generous toward appellant. Litigants who are ignorant of both law and procedure and are, consequently, of little value to the courts in clarifying issues presented by the pleadings, are real impediments to the proper administration of justice. Having lost confidence in themselves they trust no one else. They should be advised that a court cannot pin gold medals on their lapels merely because they obstruct procedure or belatedly plead for time to do, or have done, such menial tasks as having their witnesses subpoenaed. ■ Of course, any person accused of crime has the right to defend himself but that right does not entitle him to abuse the patience of courts or to infringe upon the rights of others. (See *People* v. *Chessman,* 38 Cal.2d 166, 174 [238 P.2d 1001]; *People* v. *Dorman,* 28 Cal.2d 846, 852 [172 P.2d 686].) There is not proof that appellant was prejudiced by the court's ruling. (*People* v. *Boyce,* 99 Cal.App.2d 439, 445 [221 P.2d 1011].)

### No Prejudice Caused by Instructions

Appellant assigns as prejudicial the court's instruction distinguishing the forms of theft. All three were defined and explained. He says that despite the rulings in *People* v. *Jones,* 61 Cal.App.2d 608 [143 P.2d 726] and *People* v. *Waxman,* 114 Cal.App.2d 399 [250 P.2d 339], it is a reasonable assumption from the evidence that the jury could have found

some proof of false pretenses, of embezzlement and of trick and device "which, standing alone, would not support a conviction, but taken together could have supported a conviction under the evidence. The distinctions between these types of theft are real and not artificial. Now, the problem submitted to the jury was whether appellant had committed grand theft. ▮ It is not error to omit the last paragraph of CALJIC form 231 which requires the jurors to agree as to which of the three forms of theft was committed. (*People* v. *Waxman, supra.*) The other instructions relating to the forms of theft were illuminating to the jury. They were not confined to a consideration of the one instruction only but were properly advised as to the issues generally and were required to have the concurrence of all 12 jurors.

In his closing brief appellant raises for the first time that because the information was filed February 15, 1954, and the trial was not held until May 6, and, therefore, 80 days had elapsed, before the trial, the action should be dismissed under section 1382, subdivision 2, of the Penal Code.* However, subdivision 2 refers only to those cases in which the trial had not been continued on the application of the accused. In the first place, defendant twice moved the court for continuance to a subsequent date for him to plead. ▮ In the second place, inasmuch as the record is destitute of statements as to the reasons for the delays, it is presumed that the court acted at the request of appellant in postponing the trial to a time subsequent to the expiration of 60 days from the date of the filing of the information. (Code Civ. Proc., § 1963, subd. 15.) The record contains nothing to contradict such presumption.

The judgment and the order denying the motion for a new trial are affirmed.

McComb, J., and Fox, J., concurred.

A petition for a rehearing was denied June 6, 1955, and appellant's petition for a hearing by the Supreme Court was denied June 22, 1955.

---

*Penal Code, section 1382:

"The court, unless good cause to the contrary is shown, must order the action to be dismissed in the following cases: . . .

"2. If a defendant, whose trial has not been postponed upon his application, is not brought to trial in a superior court within 60 days after the finding of the indictment, or filing of the information, or in case a new trial is to be had following an appeal from the superior court within 60 days after the filing of the remittitur in the trial court."