[Crim. No. 1520.   Fourth Dist.   Aug. 5, 1959.]

THE PEOPLE, Respondent, v. ALEX RIOS, Appellant.

Alex Rios, in pro. per., for Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Jack K. Weber, Deputy Attorney General, for Respondent.

THE COURT.—After a trial before a jury defendant was convicted of five violations of Health and Safety Code, section 11500. Four of the counts charged sale of marijuana and the remaining count charged defendant with furnishing the same narcotic to others.

Defendant declined to testify in his own behalf and offered no defense. The sufficiency of the evidence to support the verdict is not questioned. We will not detail the entire evidence presented.

Special Deputy Sheriff Joaquin Acosta testified that he was trained as an undercover narcotics investigator by the San Bernardino Police Department and functioned in that capacity. His special training included practice in simulating smoking of marijuana and feigning the reactions of a narcotics user as well as instruction in the jargon of narcotics users and peddlers. Acosta was physically examined before and after each contact with suspects and he turned purchased marijuana over to members of the vice squad of the San Bernardino Police Department who worked closely with him.

Deputy Acosta testified that he met defendant on November 5, 1957, at Eddy's Café in San Bernardino. Defendant approached the police officer and asked him to go for a ride to another place to "get some marijuana because that was the only way he could enjoy himself in a bar if he could smoke a marijuana cigarette." Then they went to Mona's Café where they met one Gabriel Galvan, also known as the "Penguin," who was supposed to have some marijuana. Defendant conferred privately with Galvan and then told the officer that he had made a deal. Deputy Acosta said that he too wanted some marijuana and then gave defendant two dollars. They left and went to an empty lot where Galvan got out and took a package from a fig tree and came back handing it to the defendant. A few minutes later defendant gave the officer three cigarettes. They drove away and one of the group lighted a brown hand-rolled cigarette which was passed around among

the persons in the car. The officer had it handed to him several times and he simulated smoking the cigarette knowing that he was being tested and watched.

On November 26, 1957, Deputy Acosta again saw the defendant at Eddy's Café. Defendant asked the officer if he wanted some marijuana and upon receiving an affirmative reply they left going to a spot on Fourth and Mount Vernon Streets where defendant left the car, returning with the package. Then the defendant gave the officer one brown hand-rolled cigarette.

On December 31, 1957, Deputy Sheriff Acosta met defendant at his home in San Bernardino. There he saw defendant and three other persons sitting around a table rolling cigarettes from a green leafy substance contained in a shoe box. After this task was finished the officer and the others went to a location on Tijuana Street where defendant left the car to dig holes to bury the cigarettes that had been rolled, but the ground was too hard so they abandoned this attempt and drove around the corner where defendant hid the package between a fence and a palm tree. Later the party returned to this location and the package was picked up. Defendant requested that he be taken home and before leaving the car he sold the officer 10 marijuana cigarettes for seven dollars.

On January 4, 1958, Deputy Acosta gave the appellant 15 dollars for an amount of marijuana in a newspaper package. On January 11, 1958, the police officer purchased three cigarettes from the defendant for $1.50. On each of the occasions described the remaining cigarettes, or substance involved, were turned in to Deputy Acosta's associate officers. Subsequently they were examined by an expert forensic chemist who formed the opinion that the substances involved were marijuana.

On April 29, 1959, defendant requested that an attorney be appointed to represent him on this appeal. This court immediately began an independent examination of the record and sent communications to defendant and his trial counsel requesting them to inform this court of any substantial grounds of appeal which would justify a reversal in this case.

Defendant replied that he seeks a reversal on three grounds: (1) that he was deprived of his right to counsel; (2) that the court improperly declined to continue the trial to enable defendant to obtain certain witnesses confined in state prisons; and (3) that certain testimony given by witnesses for the People was conflicting. The reply of defendant's trial counsel cites the court's refusal to continue the trial to enable

the witnesses to be brought in from their places of confinement as the only point on which there might exist some uncertainty, but goes on to point out that, as the trial record indicates, this ruling of the court was based on the defendant's lack of diligence in communicating the names of the witnesses and their expected testimony to his attorney so the necessary affidavits could not be filed until shortly before the trial began. Furthermore, there was a question as to the admissibility of some of the evidence to which these witnesses were expected to testify. This court then completed its examination of the record and determined that it would not be helpful to the defendant or to the court to have counsel appointed on this appeal, and denied appellant's application for counsel. (*People* v. *Hyde,* 51 Cal. 2d 152, 154 [1] [331 P.2d 42] ; *People* v. *Marsh,* 170 Cal.App. 2d 284 [338 P.2d 495].)

In considering defendant's contention that he was prejudiced by the court's refusal to appoint an attorney for him, the following facts should be considered. At defendant's arraignment on February 28, 1958, the court appointed Mr. Geram to represent him. A week later defendant appeared in court with counsel of his own choosing, Mr. Katz. Mr. Katz continued as defendant's attorney until May 26, 1958, the day set for trial, at which time Mr. Katz moved the court to release him as defendant's counsel because defendant refused to cooperate with him in his defense. Defendant admitted that he had refused to cooperate with Mr. Katz and consented to the latter's release as his counsel.

The court allowed defendant a continuance to procure new counsel. When the continuance expired, defendant told the court that he did not have financial means to employ counsel and requested the court to appoint counsel at public expense. After discovering that defendant had been released from jail on a $5,000 bail, was drawing unemployment payments and was able-bodied and looking for work, the court refused to appoint an attorney to represent him at public expense but granted another continuance to enable him to employ an attorney. The court set the case for trial on July 15, 1958, at which time the case was called and the jury box filled with 12 prospective jurors. At that time the court discovered that defendant was still without an attorney and wanted one. The court continued the case and Mr. Rosso was appointed as defendant's attorney but he was replaced on July 21, 1958, by M. Saevig, who also served under court appointment. On September 29, 1958, Mr. Saevig moved the trial court to

relieve him as counsel upon the grounds of defendant's non-cooperation, but the request was denied and Mr. Saevig represented the defendant throughout the subsequent proceedings in the trial court. In summary then, defendant was present in court on 12 occasions before trial; on seven of these occasions he was represented by counsel; of the remaining five occasions, two involved appointment of counsel, and twice the court granted continuances to enable defendant to employ counsel privately. On July 15, 1958, as soon as the defendant indicated that he desired counsel, the court requested an attorney present in court to represent defendant, but this attorney declined the case. The court then continued the case and appointed an attorney who represented defendant at all the following proceedings. Therefore at all significant proceedings defendant was represented by counsel, and he cannot complain that he had no counsel when he did have counsel. (*People* v. *Brookins*, 133 Cal.App.2d 688, 690 [284 P.2d 959].)

█ According to all appearances this attorney ably defended defendant who made no complaint in the trial court of his counsel's actions. He cannot now raise for the first time the adequacy of the defense presented. (*People* v. *Hartridge*, 134 Cal.App.2d 659, 667 [10-11] [286 P.2d 72]; *People* v. *Garrow*, 130 Cal.App.2d 75, 78 [278 P.2d 475].)

█ The defendant asserts that it was error for the court to refuse to grant a continuance on October 14, 1958, after the first full day's testimony was taken, so that defendant could bring in witnesses confined at San Quentin and Soledad. To view this contention in its true light we must recite preceding events which have a bearing on the matter. Previously on May 26, 1958, and September 29, 1958, defendant's attorneys had moved the court to relieve them because defendant refused to cooperate in his defense. On October 2, 1958, the jury which heard the case was selected and the trial was continued until October 14, 1958. On this same day the defendant filed an affidavit under Penal Code, section 2621 asking that several prisoners be brought from state prisons to testify in his defense. The court deemed the allegations in the affidavit to be insufficient and denied the request without prejudice. The affidavit is not part of the record on appeal, and the trial court's decision must be presumed to have been correct. (*People* v. *Walker*, 170 Cal.App.2d 159 [338 P.2d 536].) Arrangements were made for a judge to rule on another affidavit on Monday, October 6, but the affidavit was not filed until Friday, October 10 and was not presented to the court

until October 14, the morning the trial was resumed. The district attorney objected to the relevancy of the facts which the affidavits alleged would be the expected testimony of the confined witnesses. The court ordered that those witnesses supposedly at Chino be brought to testify but as to the witnesses confined at more distant points the ''defendant slept on his rights'' and it declined to order these witnesses brought in. At the close of the day the court was informed that the witnesses supposedly at Chino were no longer there and had been transferred from that place of confinement to Soledad and San Quentin upwards of four weeks previously. That morning defendant's counsel had indicated that the defendant had informed him that he had talked to one of the witnesses, Gabriel Galvan, at Chino over the week-end. The court then vacated its order that the witnesses supposedly at Chino be brought to court. The court noted that there had been no showing that defendant exercised due diligence to determine the whereabouts and expected testimony of the witnesses he desired and that because the prisoners were confined at places distant from the trial a further continuance would be necessary to enable them to be brought to the trial.

A request for a continuance to obtain the presence of a witness is addressed to the sound discretion of the trial court and must be supported by a showing of due diligence to obtain the attendance of the witness. (*People* v. *Lamb*, 133 Cal.App. 2d 179 [283 P.2d 727]; *People* v. *Carroll*, 160 Cal.App.2d 6, 9 [324 P.2d 713].) The Supreme Court said in *People* v. *Collins*, 195 Cal. 325, 333 [233 P. 97]:

''The absence of a witness is no cause for a continuance unless due diligence has been used by the party to procure his attendance at the trial, and due diligence imports that proper legal means must have been resorted to for the purpose of compelling the attendance of the witness.''

In the instant case there is not only an absence of evidence that due diligence was used to obtain the desired witnesses but there is affirmative proof of a lack of due diligence on defendant's part to cooperate with his counsel. In this factual context the court was well within its discretion in refusing defendant's application for a continuance. (*People* v. *Beard*, 36 Cal.App.2d 35, 39 [96 P.2d 961].)

Defendant's remaining contention that the testimony of the prosecution witnesses was conflicting is similarly without merit. The only conflict we have found in the testimony of the officers concerns the events of the evening of December

31, 1957. Deputies Acosta and Alter said defendant and Deputy Acosta met at Union Street near Mt. Vernon. Deputy Adamson, who observed the meetings through binoculars in Deputy Alter's company, testified that he ''believed'' the meeting was at Vine Street near Mt. Vernon. This minor inconsistency does not render the testimony of the prosecuting witnesses inherently improbable and defendant's contention cannot be sustained. (*People* v. *Lyons*, 47 Cal.2d 311 [303 P.2d 329].) Minor inconsistencies and conflicts in testimony are common to almost every case. (*People* v. *Carr*, 170 Cal. App.2d 181 [338 P.2d 479].) In this case there was substantial evidence to support the verdict of the jury and the conflict was too insubstantial to be grounds for reversal. (*People* v. *Baserto*, 162 Cal.App.2d 123 [327 P.2d 558].)

Judgment affirmed.