[Crim. No. 7385. Second Dist., Div. Two. Apr. 18, 1961.]

THE PEOPLE, Respondent, v. FONIE BLY, Appellant.

Fonie Bly, in pro. per., for Appellant.

Stanley Mosk, Attorney General, Doris H. Maier and John F. Foran, Deputy Attorneys General, for Respondent.

ASHBURN, J.—Defendant Bly was found guilty, as charged in Count I of conspiracy to commit forgery (Pen. Code, §§ 182, 470), and as charged in Counts II, III, IV and V, forgery of fictitious name (Pen. Code, § 470). Two prior felony convictions were found true as alleged.

Appellant claims illegal search and seizure and, absent the evidence obtained as a result of said search, that there is insufficient evidence to support the judgment. It is also contended that the refusal of this court to appoint counsel to assist appellant in this appeal was a denial of due process and equal protection of the law.

On February 3 or 4, 1960, one Howard (or Joe) Morrison called upon Sergeant Bonk of the Los Angeles Police Department. He had in his possession four checks of the Custom Built Fence Company which he showed to the sergeant saying that he had received them from the appellant with instructions to pass them. "Mr. Morrison told me [Bonk] that Fonie Bly and a fellow by the name of Blaylock and a girl by the name of Lena were engaged in the passing of checks of the Custom Built Fence Company and of the Apex Press, and of a trucking company located in Sacramento, the name of which he could not recall." At this time appellant was well known to the police; Bonk knew that appellant had had control of check protectors which were taken in a burglary some time in November of 1958 and that he had been arrested for distribution and recruiting of passers of checks and possession of check protectors. From the description given him of "Lena Mae," Bonk knew her as a person who was involved in the cashing of fictitious checks. Bonk did not know Morrison prior to this meeting, and he was not in custody. Morrison told him that he had cashed four of the Custom checks. Sergeant Bonk had information at this time that checks had been stolen from the Custom Built Fence Company and that some of these checks had been passed in Los Angeles. After this conversation, Bonk and his fellow officers conducted an investigation and learned that checks obtained in a burglary

of Simmons-Akers Music Room, as well as those taken from Custom, were being passed, and the police had obtained some of the checks that had been so reported.

On February 10, Morrison again met with Sergeant Bonk at the 77th Street Station. He had in his possession three checks written on the Simmons-Akers firm, which Bonk recognized as being a part of a series of checks taken in the reported burglaries. Morrison told Bonk they had been given to him by a distributor named Fonie Bly [appellant]; that he was supposed to cash them, then give half of each check to appellant less approximately $5.00 for a purchase. The sergeant then said, "All right, we will give you some marked money, which will be for half of one of the checks, and we will destroy that check and tell him you have cashed one." The sergeant then tore part of another one of the checks and told Morrison to tell appellant that he had presented it to an intended victim who became suspicious and he, Morrison, grabbed it out of his hand and in so doing tore it. Morrison then went to appellant's residence with $25 in marked money, which was also dusted with fluorescent powder. The police followed Morrison and about 10 to 15 minutes after Morrison entered, Officer Fallon, stationed at the rear of the house, observed appellant on the steps at the rear door of his residence in a "bent over" position. He also observed a wrapper or container consisting of folded sheets of newspaper in the bushes approximately two feet from the rear door and alongside the porch. The officers identified themselves as police officers and asked appellant his name. Appellant replied that it was Fonie Bly and at this time the officers informed him he was under arrest and that they would like to talk to him. Appellant said "Come in the house." There was no warrant for arrest or search. Morrison had left the house and was talking to Sergeant Bonk about a half block away at the time the other officers were making the arrest. Any information Bonk obtained from Morrison was not transmitted to the arresting officers.

Thereafter, Officer Fallon recovered the package from the bushes outside appellant's residence where he was seen bending over and it was found to contain a series of 25 checks stolen from the Simmons-Akers Music Room. A palm print on the newspaper wrapping was, in the opinion of the fingerprint expert, that of appellant. Included in the package was check Number 862, the same check torn by Sergeant Bonk and given to Morrison with instructions, as aforesaid; this

check bore the thumb print of appellant. Also in this package was check Number 864, another of the checks seen in Morrison's possession earlier that day. Inside the house, the marked money was taken from appellant's pocket.

Officer Hogue found an envelope containing four checks of the Custom firm in the trash can on the premises of appellant. Writing on the envelope was identified as that of defendant Walker.

Officer Bonk picked up a package on the front stoop of appellant's residence which contained five checks stolen from Simmons-Akers. Finger and palm prints upon the checks and newspaper wrappings were identified as those of defendant Blaylock. Also, writing on the face of the checks was that of Blaylock.

Approximately an hour after the arrest of appellant, defendant Blaylock arrived at appellant's residence. He was arrested and a search of his person revealed a driver's license bearing the name Jesse Lee DeVaughn, which the evidence shows was used by defendant Burns to cash two of the checks in question. Also found in his pocket was a courtesy credit card and another identification card in the name of "Eddie Wilbert Handy." Shortly thereafter defendant Burns arrived and was placed under arrest. Defendant Walker was arrested at another location.

It was stipulated that Officer Bonk was "an expert in the manner and means by which checks are commonly passed by groups of one or more persons," and, based upon all of the evidence presented, it was his opinion that the facts presented an extensive check and burglary operation; the operation resembled that in other similar cases.

It is appellant's claim that there was no probable cause for the arrest and "nothing that happened thereafter could make that arrest lawful or justify a search as its incident." As stated in *People* v. *Wright*, 153 Cal.App.2d 35, 39-40 [313 P.2d 868]: "Appellant's argument seems to assume that search, and seizure of the articles found, is justified only when there is a lawful arrest. This is not the rule. It is true that the great bulk of the cases involve an effort to justify the search by showing a lawful arrest. But it does not follow that a search or seizure may be made only in connection with such an arrest." The Supreme Court stated in *People* v. *Brown*, 45 Cal.2d 640, 643 [290 P.2d 528]: "It should be noted at the outset that the legality of an arrest is not necessarily determinative of the lawfulness of a search

incident thereto. Just as some searches may be reasonable and hence lawful in the absence of a warrant or an arrest [citation], others may be unreasonable and hence unlawful although incident to a lawful arrest. [Citations.] Accordingly, the question presented is not whether the arrest of a guilty felon is lawful in the absence of reasonable cause for the officer to believe him guilty, but whether the search incident to the arrest is reasonable, . . ." (See also *People* v. *Ball,* 162 Cal.App.2d 465, 467 [328 P.2d 276]; *People* v. *Murphy,* 173 Cal.App.2d 367, 378 [343 P.2d 273].)

■ This court pointed out in *People* v. *Sanson,* 156 Cal. App.2d 250, 254 [319 P.2d 422], that "the reasonableness of a search is not to be justified by what the search turns up 'but by appearances to the searcher at the time of his action.' So long as the officer reasonably evaluates these appearances and acts accordingly the rights of the accused are adequately safeguarded." In the instant case, the search was reasonable and justified without reference to the arrest.

■ As pointed out by respondent, Exhibits 8 and 9, the checks wrapped in newspapers found on the front stoop and in the bushes by the back porch, were not obtained by any "search," for the mere observation of that which is in open view does not constitute a search. (*People* v. *Sterling,* 154 Cal.App.2d 401, 405 [316 P.2d 405]; *People* v. *Spicer,* 163 Cal.App.2d 678, 683 [329 P.2d 917].) "Entry upon the premises does not fall in that category." (*People* v. *Escobosa,* 179 Cal.App.2d 751, 754 [3 Cal.Rptr. 917].) In *People* v. *Andrews,* 153 Cal.App.2d 333 [314 P.2d 175], it was claimed that the police officer was in an illegal position when he stood at the window, since he had walked 5 feet over private property, and therefore that the search and seizure were not justified by what he saw through the window. At page 337: "The evidence concerning the information the officers had, in advance, was sufficient in itself to show that they had reasonable or probable cause for these arrests. [Citations.] The objects which the officer saw through the window, and the position of the parties showing they were apparently preparing to take a 'fix,' were additional factors supporting his belief that they were committing a felony in his presence, and were preparing for a further illegal activity. While there was a seizure here there was very little search since nearly all of the objects were in sight and it would violate every element of common sense to hold that such search as does appear was unreasonable under the circumstances. The

mere looking through a window cannot reasonably be held to be an 'unreasonable' search and seizure. [Citations.] An officer does not have to close his eyes to what is in open view before him. [Citation.] In *Hester* v. *United States,* 265 U.S. 57 [44 S.Ct. 445, 68 L.Ed. 898], the court said: 'It is obvious that even if there had been a trespass, the above testimony was not obtained by an illegal search and seizure.' In *Martin* v. *United States,* 155 F.2d 503, the court said: 'The Fourth Amendment secured the people against not all, but only unreasonable searches and seizures of their persons, houses, papers, and effects. Enclosed or unenclosed grounds or open fields around their houses are not included in the prohibition.' "

It is therefore claimed by respondent that Exhibits 8 and 9 do not come within the exclusionary rule and were admissible. In addition there is Exhibit 14, the checks found in the trash can. It can hardly be said that papers discarded to the trash can are the object of an illegal search and seizure. Also, there are Exhibits 1, 2, 3, 5, 10, 11 and 12—checks that were passed and recovered from the victims of the crimes, all checks of the Custom or Simmons-Akers firms. Numbers 10, 11, 12 and 13 were linked to appellant by means of handwriting comparisons of exemplars prepared by appellant and letters and figures appearing in the upper left-hand corner of these checks. Numbers 1, 2, 3 and 5 were linked to appellant by circumstantial evidence. Numbers 2 and 3 were passed by defendant Burns, who was identified by the victims. The writing on the face of Exhibit 1 was identified as that of Blaylock. Walker's own testimony establishes that he attempted to cash Exhibit 5. Particularly damaging was the testimony of Morrison, called as a witness for the defense, who testified as to his acquaintance with Burns and Blaylock, and as to the arrangement for passing the checks, involving appellant in this conspiracy. There is sufficient and substantial evidence to sustain the verdict as to each count regardless of the validity of the arrest.

██ There is no merit to appellant's last contention. This court, after examination of the record, filed an order in this cause on November 1, 1960, containing this statement: "This court having considered defendant's application for the appointment of counsel to represent him on appeal herein, and it appearing that it would be neither advantageous to the defendant nor helpful to the court to have counsel appointed, the application is denied. . . ." This is the procedure approved by the Supreme Court in *People* v. *Hyde,* 51 Cal.2d

152, 154 [331 P.2d 42]. (See also *People* v. *Gillette,* 171 Cal.App.2d 497, 507 [341 P.2d 398] ; *People* v. *Rios,* 172 Cal.App.2d 623, 626 [342 P.2d 317] ; *People* v. *Williams,* 172 Cal.App.2d 345, 348 [341 P.2d 741] ; *People* v. *Galceran,* 178 Cal.App.2d 312, 315 [2 Cal.Rptr. 901].) ██ ''[A] state's failure to furnish the services of an attorney to a defendant who is unable to employ his own counsel is not a denial of federal due process unless it leads to 'fundamental unfairness.' '' (See *People* v. *Mattson,* 51 Cal.2d 777, f.n. 8, p. 796 [336 P.2d 937] ; also *People* v. *Vigil,* 189 Cal.App.2d 478, 480 [11 Cal.Rptr. 319].) The briefs filed by appellant in propria persona are adequate and fully discuss the issues on appeal.

Judgment affirmed.

Fox, P. J., and Herndon, J., concurred.

A petition for a rehearing was denied May 16, 1961.